Robert E. Topel and Joseph L. Bialek, Plaintiffs-Appellees, v. Edward C. Porter, Individually and as Trustee Under Trust Agreement Known as Porter Realty Trust, Defendant. Price Brothers, Inc., a Corporation, Defendant-Appellant.

Otis Elevator Company, a Corporation, Defendant, and Price Brothers, Inc., a Corporation, Counter-Plaintiff and Third Party Plaintiff-Appellee, v. Otis Elevator Company, a Corporation, Counter-Defendant, and Westinghouse Electric Corporation, Third Party Defendant-Appellant.

Gen. No. 50,965.

First District, Third Division.

May 9, 1968.

315

Hubbard, Hubbard, O'Brien & Hall, of Chicago (Alvin G. Hubbard, Reese Hubbard, and Frederick W. Temple, of counsel), and Hinshaw, Culbertson, Moelmann & Hoban, of Chicago (John M. Moelmann and D. Kendall Griffith, of counsel), for appellants.

Bunn and Bunn, of Chicago (Robert J. Rafferty, of counsel), for appellees. Andrew J. Farrell, of Chicago, for cross-appellee.

## ON REHEARING

JUSTICE SULLIVAN delivered the opinion of the court.

In this case defendant Edward C. Porter, individually and as Trustee under Trust Agreement known as Porter Realty Trust, obtained a directed verdict of not guilty at the end of the plaintiffs' case, plaintiffs obtained money judgments against Price Brothers, Inc., judgment was entered in favor of defendant Otis Elevator Company

upon the jury verdict, a judgment was entered in favor of counterdefendant Otis Elevator Company on the counterclaim of Price Brothers, Inc. against it, and third-party plaintiff Price Brothers, Inc. obtained a judgment upon a jury verdict against third-party defendant Westinghouse Electric Corporation.

This action arose out of an accident on the premises at 4301 West Madison St., Chicago. Those premises were owned by Porter Realty Trust, and Price Brothers, Inc. had been the exclusive tenant thereof for more than ten years prior to the accident. Under the tenancy Price Brothers was solely responsible for maintenance and repairs, although the owner paid for major or structural alterations.

On the property was a freight elevator which had been in the building since 1918. Plaintiffs, Topel and Bialek, were employees of Westinghouse Electric Corporation and, in that capacity, came on the premises to remove and repair a drum from the elevator.

Price Brothers had employed the services of Otis Elevator Company for some years prior to the accident. There was a service contract between the companies whereby Otis was to undertake the weekly maintenance of the elevator for a fee of $32 per month. This contract provided for only the small routine upkeep. If any larger items of service were called for, Otis was to notify Price Brothers and submit a price estimate therefor. The last written service contract between the two introduced into evidence covered the period of October 1, 1955, to July 31, 1956. However, it appeared that the agreement was continued until January 15, 1957, when Otis cancelled the contract.

In 1952 Otis reroped the safety device on the elevator, and, according to the ordinary business records, safety checks were made in 1952, 1954 and 1955. The last safety check was in mid-1955. In December, 1956, Otis wrote to

317

Price Brothers and recommended resocketing of hoisting ropes, testing of counterweight ropes and a safety-device check. The letter stated in part:

"Our experience has shown that it is advisable to test car safety devices annually, in order to determine if they are functioning properly. This cannot be determined by a visual inspection in the field and as we have no record of making safety tests on your elevator the past year, we recommend that such tests be made."

Evidently no action was taken on that letter by Price Brothers. On January 15, 1957, Otis wrote to Price Brothers cancelling their service contract because Price Brothers had elected to have another company weld a cracked drum rather than have it replaced with a new one. According to Hiatt, Price Brothers' chief engineer, from that date until the start of the work by Westinghouse, no one ever came on the premises to conduct a safety test on the mechanism. There was no evidence of routine servicing during that period (January–July, 1957).

There was no evidence as to what sort of safety tests were performed during the years 1952–1955, but witnesses stated that several types were possible: a broken-rope test, a free fall, an overspeed test, tests with loads and tests without loads. Any of these would allegedly have revealed misroping. There was also testimony that a visual inspection might not reveal such a defect inasmuch as the machinery was old and the younger men might not be familiar with it.

The contract for repair of the drum by Westinghouse was executed in March, 1957. The salesman for Westinghouse testified that during his preliminary talks with Price Brothers he was told that drum repairs were all that were necessary since they had a service contract with

318

another company. However, in the letter of Hiatt to Westinghouse of March 13, 1957, the drum work was agreed to and there was a suggestion that they discuss a service contract to begin after the work was done. On July 16, 1957, a service contract was executed to take effect August 1, 1957.

The repair work was to be done during the annual plant vacation and was to consist of removal, repair and reinstallation of the drum. From the evidentiary descriptions it appears that the elevator machinery ran from 2-3 feet below the bottom floor to a penthouse. The drum was located in the penthouse. The car was held up by six cables. Two ran from the car to the drum, two from the drum to the counterweights and two from the car to the counterweights. The safety device is activated by a safety governor at the top of the shaft. Under the car are three sheaves, two vertical and one horizontal. The horizontal one is in the middle and measures about 14 inches in diameter. There is a manilla rope running from the governor through one side sheave, passing around the center sheave and leaving the bottom of the car by the other side sheave. From there it runs up the side of the car to another small sheave at the top of the car and then down to a tension sheave at the bottom of the pit. These ropes all run on one side of the elevator. If the rope passes through the governor at too great a speed the governor stops the rope thereby activating wedges which go against one side of the safety jaws. The other side of the jaws clamp on the rails and stop the car.

July 15, 1957, was the first day that Westinghouse was on this job. The job boss, Hadden, and plaintiff Topel were on the premises. They went up to the penthouse, drilled through the roof and hung a chain fall which they planned to use to lower the drum to the car at the fifth level so they could then lower both drum and

car to the ground. The next day plaintiff Bialek was also on the job. That day they disconnected the drum to car and drum to counterweight cables. Still connected were the governor to the safety rope and the car to counterweight cables. These cables alone would support about 60% of the weight of the car.

Before the cables were removed the men constructed a sling. The car-to-counterweight cables were clamped together in a two-gripper. This consists of two plates about 3 × 12 inches with a large eyelet at the top. The cables fit in between the plates which are then held together by studs with nuts tightened on them. Once the cables were securely clamped the sling was completed by wrapping another cable two or three times around a permanent beam in the penthouse, then down through the eyelet of the two-gripper and back up to the beam. That end was wrapped several times around the beam. The loose ends were then fastened with Crosby clips. These clips were U-shaped with the saddle arrangement for the cables to lie in. Once they are in place (in opposite directions to each other) the top is laid in place and nuts are tightened for pressure. Two clips were put on that day by Bialek and the elevator hung in the sling overnight. On July 17, 1957, Bialek added a third clip to the sling. This was done under the supervision of Hadden.

They then cleared out the car and attached a hoist machine to a cable sling from roof timbers. The drum measured about 3 feet in diameter and 4–5 feet in length, and weighed 2,000–3,000 pounds. The rated capacity of the safety device was 4,000 pounds. Bialek and Topel were in the car waiting to guide the drum into position onto a dolly in the car. Once that was done Hadden intended to attach another chain hoist to the car so that it could be lowered to the ground with the drum in it. The sling they had constructed would have to be removed before the car was lowered.

However, just as the drum touched the dolly the sling gave way, the safety device failed to operate properly, and the car dropped five floors to the pit. Plaintiffs there sustained the injuries which are the subject matter of this suit. Hadden testified that when he looked at the sling which had given way he found that the cable was unravelled halfway through and the core had been pulled off the end.

After the accident, according to a Westinghouse employee, the safety jaws were found locked open. An investigation of the incident a few days later indicated that the governor had functioned properly but that the rope underneath the car was improperly reeved so as to cause the safety jaws to work in a reverse direction. Most of the testimony indicated that the rope was crossed under the car.

There was conflicting testimony as to contributory negligence of the plaintiffs and negligence of Westinghouse. Other elevator men testified as to the precautions they would have taken in similar circumstances. One of these was additional slings. However, these would have had to be removed before the car could have been lowered to the ground. The same would have been true of additional Crosby clips. These witnesses indicated that three Crosby clips should have been sufficient for the sling that was constructed. Another suggestion was that the chain hoist by which the car was to have been lowered should have been attached prior to lowering of the drum into the car. It was also suggested that the workmen could have set the safety device manually while loading the drum into the car. Hadden testified that he doubted that he or any one man could have exerted the necessary force to do this. He went on to say that it might also have taken them several hours to unset it so as to be able to lower the car.

Several witnesses estimated the distance the car could have fallen freely had the safety device worked properly. These estimates ranged from 42 inches to 10 feet.

Plaintiffs brought suit against Porter (the owner of the property), Price Brothers and Otis. Price Brothers counterclaimed against Otis and brought a third-party action against Westinghouse. Defendant Porter was granted a directed verdict of not guilty at the end of all the plaintiffs' evidence. The jury verdicts were in favor of plaintiffs and against Price Brothers in amounts of $45,000 (Topel) and $5,000 (Bialek); in favor of defendant Otis and against plaintiffs; in favor of counterdefendant Otis and against counterclaimant Price Brothers; and in favor of third-party plaintiff Price Brothers and against third-party defendant Westinghouse. The special interrogatory asked the jury to determine whether Price Brothers was guilty of active negligence and was answered "No."

This court is presented with three appeals. Price Brothers is appealing from the judgment against it and in favor of plaintiffs. The points raised are that: as a matter of law the alleged negligence of Price Brothers was not the proximate cause of plaintiffs' injuries; the plaintiffs were guilty of contributory negligence as a matter of law, and the verdict is contrary to the manifest weight of the evidence.

Westinghouse is appealing from the judgment over against it and in favor of Price Brothers. The points raised on appeal are that the complaint charged and the evidence showed Price Brothers guilty of active negligence thereby precluding this action over and making the judgment and answer to the special interrogatory contrary to the manifest weight of the evidence; that the trial court made several improper rulings on evidence consisting of a Westinghouse intraoffice memorandum; that the court erroneously refused to instruct the jury

that active negligence on the part of Price Brothers would constitute a full defense to the third-party action, and that improper and prejudicial argument by Price Brothers' counsel was allowed.

Finally plaintiffs (Topel and Bialek) are appealing, seeking reversal of the judgment in favor of Otis. This review is sought only if they are unsuccessful in maintaining the judgments against Price Brothers. The points raised in this appeal are that the verdicts are against the manifest weight of the evidence, and that Otis, as an independent contractor employed by Price Brothers, remained liable for the defective safety device after the cancellation of the service contract.

Price Brothers' appeal will be considered first. The first contention is that the court erred in denying the motion by Price Brothers for directed verdict because, as a matter of law, the negligence of Price Brothers was not the proximate cause of the plaintiffs' injuries and plaintiffs were guilty of contributory negligence.

Price Brothers cites many cases which give definitions of proximate cause and what may or may not be a third-party intervening cause which relieves the original party from liability. One case, Seith v. Commonwealth Elec. Co., 241 Ill 252, 98 NE 425, said on page 259:

> "To constitute proximate cause the injury must be the natural and probable consequence of the negligence, and be of such a character as an ordinarily prudent person ought to have foreseen might probably occur as a result of the negligence."

None of Price Brothers' cases, however, are factually applicable to this case.

Plaintiffs cited McGregor v. Reid, Murdoch & Co., 178 Ill 464, 53 NE 323, an action based on the alleged negligence of defendant in maintaining its freight elevator. Plaintiff there was an employee and was seriously in-

jured when the cables pulled out of their sockets and, once the elevator began to fall, the safety device failed and the car fell from the third floor to the basement. The court discussed proximate cause and stated on page 470:

> "It was the falling of the elevator that caused the injury, and it was caused to fall not alone by the pulling out of the cables from their attachments to the elevator frame, but also by the defective condition of the safety device, which prevented it from taking hold of the sides of the elevator shaft and holding the elevator in place. Appellant's declaration is sufficient to sustain a finding based on either defect, or on both combined.
>
> . . . . . .
>
> "Appellee insists that the pulling out of the cable ends from their fastenings was the proximate cause of the injury, and that no recovery can be had for what is supposed to be the remote cause of the accident,—the defective condition of the safety device. But this position is clearly untenable. The two causes operated together, and neither, alone, would have caused the elevator to fall, and if the pulling out of the cables was attributed to an accident or to the negligence of a third person, and still the elevator would not have fallen without the negligence of the appellee, appellee would be liable, for both causes, operating proximately at the same time, caused the injury . . . . And we have held that 'where a party is injured by the concurring negligence of two different parties, each and both are liable, and they may be sued jointly or separately.' "

See also Seigel, Cooper & Co. v. Trcka, 218 Ill 559, 75 NE 1053.

■ This case falls well within the scope of the McGregor decision on the facts. The broken sling and the

324

defective safety device acted concurrently to produce the plaintiffs' injuries and neither, without the other, would have caused them. Furthermore, the jury was properly instructed as to the meaning of proximate cause and they must have determined that Price Brothers' actions were sufficient to hold them liable. We cannot say as a matter of law that Price Brothers was not the proximate cause for there was sufficient evidence contrary to that position to at least make it a question of fact for jury determination.

■ ■ Price Brothers also charges that the plaintiffs were guilty of contributory negligence as a matter of law. Ordinarily, the question of contributory negligence is one for the jury. The court in Pollard v. Broadway Cent. Hotel Corp., 353 Ill 312, 187 NE 487, a personal injury action, said on page 322:

> "To authorize this court to say, as a matter of law, that there was such contributory negligence on the part of the plaintiff or that she was guilty of the lack of such ordinary care or caution for her own safety as to defeat her recovery, we must be able to say that all reasonable and unbiased men, acting within the limits prescribed by the rules of law, would agree that she was not, at and for a reasonable time prior to the injuries sustained by her, in the exercise of due care and caution for her own safety and that as a result thereof she contributed to the injuries received by her . . . . The question as to whether she was or was not in the exercise of ordinary care and caution for her own safety must be solved by a jury."

In the record before us we see that the plaintiffs were new in the field of elevator maintenance. Topel had been in it for about a year and Bialek had been so for only a month and a half. They were directed by a job supervisor and took orders from him as to how the work was to be

done. Neither was familiar with the type of machinery in the elevator at the premises, as it was an old one. They did not test the safety device prior to the accident, but they were not required to do so under the contract between Price Brothers and Westinghouse. The procedure they followed in constructing the sling was a normal one, according to expert testimony. Price Brothers argues because the procedure was a normal one and the sling failed one must reach the conclusion that plaintiffs negligently constructed the sling. It should be noted that Topel merely tightened the two-gripper, which did not give way. Bialek, a man of less than two months' experience on the job, attached and tightened two Crosby clips the day before the accident. The sling held the elevator overnight, thus indicating (at least to plaintiffs) the work had been properly performed. A third clip was attached on July 17th. The fact that the sling later gave way could indicate that the clips or bolts were faulty just as reasonably as it could mean Bialek was guilty of contributory negligence in tightening the bolts. We cannot, by mere surmise, conclude that plaintiffs were negligent in constructing the sling.

While it is possible that additional precautionary measures could have been taken, such as attaching the chain hoist prior to the lowering of the drum onto the dolly, such decisions were not up to the plaintiffs but rather to their superior, and, furthermore, since they were new in the field they could not be expected to know all the intricacies of elevator repair. They were to follow reasonable directions, not manage the job. These factors were sufficient to have raised a question of fact as to whether the plaintiffs were guilty of contributory negligence, and that issue was determined in favor of plaintiffs by the jury.

Price Brothers finally contends that the verdict in favor of plaintiffs is against the manifest weight of the evi-

dence which showed that Price Brothers was not negligent, that the alleged negligence of Price Brothers was not the proximate cause of the plaintiffs' injuries, and the plaintiffs were guilty of contributory negligence.

█ Price Brothers was in full control of the elevator, having been sole possessor of the premises for some ten years prior to the accident. They were told on several occasions (in letters from Otis) that annual safety tests were necessary and yet they failed to procure such a test from mid-1955 to July, 1957. The question of negligence was one for the jury. Price Brothers knew, or should have known, the necessity for the safety tests and yet made no effort to have them made. This alone constituted negligence and the jury's conclusion was justifiable. There was also sufficient conflict in evidence on the questions of proximate cause and contributory negligence to form questions of fact to be determined by the jury, and we are unable to say the findings thereon were against the manifest weight of the evidence.

For the above reasons the verdict and judgment in favor of plaintiffs and against Price Brothers must be affirmed.

Westinghouse is appealing from the judgment over against it and in favor of Price Brothers. Its primary contention is that Price Brothers was guilty of active negligence as a matter of law and, therefore, the judgment and the answer to the special interrogatory are unsupported by any evidence or are at least contrary to the manifest weight of the evidence. The special interrogatory found that Price Brothers was not guilty of active negligence. Westinghouse now contends that this court should rule that the finding of no active negligence on the part of Price Brothers was against the manifest weight of the evidence.

It was shown above that Price Brothers was negligent in failing to maintain the elevator in proper working

order and in neglecting to have the safety device thereon thoroughly checked. It was also shown that the breaking of the sling and the failure of the safety device acted together in causing the injuries to plaintiffs. Of particular import is the fact that Price Brothers was notified in December, 1956, that a safety test was in order and yet no effort was made on its part to have this done for the seven month period between the notice and the accident. In fact no servicing was shown during that period other than an unsuccessful repair of the drum. Price Brothers certainly knew that any elevator, and particularly one nearly forty years old, should have regular servicing and safety checks. Furthermore, it was shown that Price Brothers did not want any work done on the elevator until the annual plant vacation. Even then no mention was made of plans for a safety check.

Price Brothers refers us to Reynolds v. Illinois Bell Tel. Co., 51 Ill App2d 334, 201 NE2d 322; Trzos v. Berman Leasing Co., 86 Ill App2d 176, 229 NE2d 787, and Sargent v. Interstate Bakeries, Inc., 86 Ill App2d 187, 229 NE2d 769. While these cases discuss active and passive negligence and state that one tortfeasor may recover from another if the former is guilty of passive negligence and the latter is guilty of active negligence, they differ from the case at bar. In each of those cases the court had before it only the pleadings, as the evidence had not yet been heard. Those courts held that when it is possible that the proof at trial might show the original defendant to be guilty of only passive negligence and the third-party defendant or counterdefendant guilty of active negligence, the third party action or counterclaim should not be dismissed. In the instant case all of the evidence had been presented. It is the function of this court to review the findings based upon that evidence. We need not make suppositions as to what that evidence may show.

Price Brothers argues that all it did was fail to have the safety device tested a fourth time. Relying on Reynolds and Sargent, supra, it says that positive acts such as parking an automobile may constitute passive negligence and certainly, therefore, failure to have the safety device tested a fourth time was mere passive negligence. (The last test was made approximately two years prior to the accident although Otis had advised Price Brothers that a safety test should be made annually.) It is to be noted again that Reynolds and Sargent were decided on the pleadings and the court pointed out that the acts might have been active or passive and that determination had to await the evidence. The court in McFall v. Compagnie Maritime Belge (Lloyd Royal) S. A., 304 NY 314, 107 NE2d 463, a New York Court of Appeals case, discussed the matter of active-passive negligence and said on page 471:

> "The only evidence in the record which would permit a jury to find Dow negligent was that indicating that the carbon tetrachloride was shipped in drums which were inadequate for the purpose intended and the jury so found. That act was not a mere failure to perform a nondelegable duty imposed by law which, under the circumstances should have been performed by another—it was an act of affirmative negligence."

Thus Dow was held to be actively negligent for its failure to provide drums which were proper and safe for the purpose for which they were intended. That case was appealed after a trial on the merits. Analogously, Price Brothers failed to provide a proper safety device on the elevator machinery and thereby provided Westinghouse, a business invitee, with an unsafe place to work.

In discussing another third-party action in the same case the court in the McFall case said on page 472:

329

"While that is not always determinative, since *either a fault of omission or one of commission may constitute active negligence. . . .*" (Emphasis supplied.)

 The distinction between active and passive negligence is a court made one and there is no single comprehensive definition thereof. To date the cases have been decided on the facts of each case. Price Brothers classifies its negligence as a mere failure to have a fourth safety test. However, it was a failure to do so after it was told of the necessity therefor. Furthermore, Price Brothers supplied Westinghouse and plaintiffs with an unsafe place to work and did not warn them of the possible dangers. Price Brothers argues that Westinghouse had the duty to perform the work safely but such duty did not include the responsibility of checking the safety device. That was solely the responsibility of Price Brothers and was never assumed by Westinghouse or plaintiffs. We feel that this is proof of active negligence on the part of Price Brothers and that the answer to the special interrogatory is wholly inconsistent with the evidence presented at the trial. The conclusion expressed in the answer to the special interrogatory indicates "that the jury misunderstood the issues or disregarded the court's instructions." Freeman v. Chicago Transit Authority, 33 Ill2d 103, 106, 210 NE2d 191. There was no evidence presented from which the jury could have reasonably concluded that Price Brothers was guilty of only passive negligence. The answer cannot stand and the verdict based on it in favor of Price Brothers and against Westinghouse must be reversed.

Westinghouse also raised several procedural points in its appeal. However, in the circumstances of this case (insofar as we found Price Brothers guilty of active negligence as a matter of law, thus barring its recovery

from Westinghouse on the action over) any prejudice against Westinghouse in the trial is rendered harmless by our reversal of the judgment.

Finally, plaintiffs, Topel and Bialek, filed an appeal seeking review of the judgment against them and in favor of Otis. This review was sought only in the event that plaintiffs were unsuccessful in maintaining their judgments against Price Brothers. Because that judgment has been affirmed we need not consider the merits of plaintiffs' appeal.

The judgment in favor of plaintiffs and against Price Brothers is affirmed. The answer to the special interrogatory finding Price Brothers not guilty of active negligence is set aside. The judgment in favor of Price Brothers and against Westinghouse is reversed.

Affirmed in part and reversed in part.

DEMPSEY, P. J. and SCHWARTZ, J., concur.