MITCHELL J. MAZANEK, Plaintiff, v. ROCKFORD DROP FORGE COMPANY, Defendant and Third-Party Plaintiff-Appellee (General Electric Company *et al.*, Third-Party Defendant-Appellant).

Second District   No. 83—1087

Opinion filed March 14, 1985.

James J. Reidy, Ltd., of Chicago, and John Patrick Healy, of Debruyne & Roman, P.C., of Rockford, for appellant.

Frederic T. Brandt, of Rockford, for appellee.

JUSTICE SCHNAKE delivered the opinion of the court:

The plaintiff, Mitchell J. Mazanek, an employee of General Electric Company (GE), was injured in an electrical fire while cleaning a switchgear at a manufacturing plant of Rockford Drop Forge Company (RDF). GE had manufactured the switchgear and had sold it to RDF.

Mazanek brought a negligence action against RDF, seeking to recover damages for his injuries. RDF, in turn, filed a third-party action for indemnity against GE and one of its divisions, General Electric Supply Company (GESCO). The actions were tried simultaneously before a jury. During the trial Mazanek entered into an agreement with GE whereby, in return for $65,000 and a separate settlement of his claim against GE under the Workers' Compensation Act, Mazanek agreed to indemnify GE for any judgment rendered against it in the third-party action. In the underlying negligence action, the jury returned a verdict in favor of Mazanek and against RDF in the amount of $540,000. In the third-party action the jury found that RDF was entitled to indemnity from GE, but that such indemnity had been lim-

ited by a service contract to the cost of cleaning the switchgear, or $2,721.22. Judgment was entered on these verdicts, and RDF appealed.

In *Mazanek v. Rockford Drop Forge Co.* (1981), 98 Ill. App. 3d 956, 424 N.E.2d 1271 (*Mazanek I*), this court held that the $540,000 judgment in favor of Mazanek and against RDF should be reduced by $65,000 to reflect the money paid to Mazanek by GE under their settlement agreement. In all other respects that judgment was affirmed. Concerning the third-party action, this court held that the jury should not have been called upon to construe the service contract, and that the limitation of liability clause in the contract was inapplicable. The judgment in the third-party action was, therefore, reversed, and that action was remanded for a new trial. Both Mazanek and GE had argued that RDF was barred from any indemnity, as a matter of law, because RDF was guilty of active negligence. This court declined to address that issue, however, concluding that it did not have jurisdiction to do so because neither Mazanek nor GE had filed a cross-appeal.

On remand counsel for Mazanek entered his appearance as additional counsel for GE in order to protect Mazanek's interests in the outcome of the third-party action. The matter was tried before a jury which found that RDF was entitled to indemnity from GE. Judgment was entered on this verdict in the amount of $646,950.28, representing the amount of the original judgment reduced according to this court's opinion in *Mazanek I*, plus interest and costs. GE has appealed, bringing the case before this court for the second time.

GE reasserts the argument it made during the first appeal, that RDF is barred from recovering indemnity, as a matter of law, because it was guilty of active negligence. GE maintains, alternatively, that various trial errors require reversal and remandment for a new trial. Finally, GE contends that there was no proper statutory basis for the award of a certain portion of the interest included in the judgment. Under the view we take of this case, it will be necessary to address only the first issue.

RDF purchased the switchgear involved in this case, an AKD-5 Powermaster, from GE in 1962, and it was installed in RDF's plant in 1963. The device was used to control the use of electricity in different locations in the plant. This control was achieved by circuit breakers which would trip open when too much current was drawn by the particular equipment involved. The circuit breakers were enclosed in compartments and were connected to stabs, or metal prongs, located at the back of the compartments. The stabs were extensions of bus

bars which were located in separate bus compartments behind the circuit breaker compartments. Behind the bus compartments were the cable compartments at the back of the switchgear.

The switchgear was installed in the compressor room at RDF's plant. The room was not free of dust, but neither was it excessively dusty. The parties presented conflicting testimony regarding whether the AKD-5 Powermaster, which was not "dust-secure" equipment, was appropriate for that location. In 1963 dust-secure switchgears were available from GE. Walter Fulton, RDF's plant engineer from 1960 until 1977, testified that RDF selected the AKD-5 Powermaster for that location on the recommendation of Edmund Brown, an application engineer and sales representative for GE.

Along with the switchgear, GE provided RDF with a manual describing its construction and operation, and explaining installation and maintenance. The section on maintenance began as follows:

"A periodic maintenance schedule must be established to obtain the best service from the switchgear. An annual check and overall maintenance procedure for the switchgear devices and all connections, must be followed as a minimum requirement. Equipment subject to highly repetitive operation may require more frequent maintenance.

A permanent record of all maintenance work must be kept."

Underneath this introductory message there were separate headings for each of the different compartments of the switchgear. Under the heading "BUS COMPARTMENT" appeared the following entries, among others:

"a. Inspect the busses and connections carefully for evidence of over-heating or weakening of the insulating supports.

\* \* \*

c. Wipe and vacuum clean the busses and supports."

RDF did not follow these instructions in the manual and did not perform any maintenance on the switchgear, either by itself or by an independent contractor, for a period of 10 years. At trial RDF presented evidence concerning the difficulty of performing the required maintenance procedures. Andrew Frank, a professor of electrical engineering at the University of Wisconsin who testified as an expert witness for RDF, stated that in order to safely clean and inspect the switchgear annually, RDF would have had to de-energize the switchgear for a period of two or three days per year. De-energizing the switchgear would have cut off all of the power from the manufacturing plant. Frank testified about various alternative designs for the switchgear which would have permitted safe inspection and cleaning

without a complete cutoff of electrical power to all locations in the plant.

In April of 1973 RDF contacted GESCO to have the switchgear cleaned and inspected because RDF employees had noticed some dirt in one of the breaker compartments and dust on an insulator. Fulton testified that he was aware that if there was dust on the insulating supports in the bus compartments, the switchgear "would be a hazard." He stated that it was obvious that such a situation would give rise to the possibility of an explosion caused by an electrical arc. Fulton testified that when he contacted GESCO in 1973 he told Mr. Osters of GESCO that RDF would make a weekend available for the inspection and cleaning so that the switchgear could be de-energized while the work was performed. Osters responded that he had been informed by GE that it would not provide the service on weekends, and that its employees could work on switchgears whether they were energized or de-energized. RDF presented expert testimony to the effect that servicing the switchgear while it was energized was a violation of the National Electrical Safety Code and the instructions in the GE manual.

On July 12, 1973, a four-man crew from GE arrived at RDF's plant and began work on the switchgear. Richard Ebert, one of the four men, was in charge of the work. Mazanek was the least experienced member of the crew. On that day, which passed without incident, they cleaned and inspected the circuit breakers and the breaker compartments, and on the following day that work continued. At one point, while Mazanek was wiping out the front of a breaker compartment with a rag, an explosion and fire occurred in the switchgear, severely injuring him. Mazanek sustained burns over 50% of his body and was permanently disabled. Mazanek was not wearing protective clothing at the time of the explosion. At trial RDF presented expert testimony regarding the availability of such clothing.

The explosion was caused by an electrical arc which originated on an insulating support in the bus compartment. The arc was able to occur because of an accumulation of dust on the support. Initially, the dust had given rise to a "tracking" phenomenon, in which current flowed from one bus bar to another through the dust on the insulating support. The arc was probably caused by a slight realignment of the track, which, in turn, was probably caused by the actions of the GE workers in the breaker compartment. Frank stated that the tracking could have existed for many months prior to the realignment and arc.

■ As noted above, GE contends that under the evidence recounted above, RDF is barred from recovering indemnity, as a matter

of law, because RDF was guilty of active negligence. The industrial accident in this case occurred prior to our supreme court's decision in *Skinner v. Reed-Prentice Division Package Machinery Co.* (1978), 70 Ill. 2d 1, 374 N.E.2d 437, *cert. denied* (1978), 436 U.S. 946, 56 L. Ed. 2d 787, 98 S. Ct. 2849, which recognized a cause of action for contribution among joint tortfeasors based on the relative degree to which their conduct contributed to the plaintiff's injuries, and prior to the adoption of "An Act in relation to contribution among joint tortfeasors" (Ill. Rev. Stat. 1983, ch. 70, par. 301 *et seq.*), which implemented the *Skinner* decision. Accordingly, this case is governed by the common law as it existed prior to *Skinner*. *Skinner v. Reed-Prentice Division Package Machinery Co.* (1978), 70 Ill. 2d 1, 17; Ill. Rev. Stat. 1983, ch. 70, par. 301.

At common law there was no right of contribution among joint tortfeasors. In order to mitigate the harsh effect that could result from an inflexible application of that rule, the courts developed the theory of implied indemnity, under which indemnity was allowed where the conduct of the indemnitor was characterized as active negligence or the primary cause of the plaintiff's injuries, and that of the indemnitee was characterized as passive negligence or the secondary cause. (*Carver v. Grossman* (1973), 55 Ill. 2d 507, 511, 305 N.E.2d 161.) There must have been a qualitative distinction between the negligence of the two tortfeasors if the action for indemnity was to succeed. (*Chicago & Illinois Midland Ry. Co. v. Evans Construction Co.* (1965), 32 Ill. 2d 600, 208 N.E.2d 573.) Our supreme court noted in *Carver* that the terms active and passive negligence "have not obtained precise judicial definition," but stated that "previous decisions fairly well delineate the areas wherein conduct may be termed active or passive negligence." (*Carver v. Grossman* (1973), 55 Ill. 2d 507, 511.) If the third-party plaintiff was guilty of active negligence, he could not recover indemnity whether the third-party defendant's negligence was active or passive. (55 Ill. 2d 507, 514.) The court in *Carver* also declared:

"[T]he facts of the case must clearly justify indemnification. If they do not, the net effect of the application of the implied indemnity theory will be not only to allow contribution but to permit the total shifting of responsibility to one negligent party while permitting the other to totally escape the responsibility for his negligent conduct." 55 Ill. 2d 507, 512.

In support of its argument that RDF"s negligence was active, GE cites *Topel v. Porter* (1968), 95 Ill. App. 2d 315, 237 N.E.2d 711, and *General Telephone Co. v. New Berlin Transit, Inc.* (1984), 126 Ill.

App. 3d 698, 467 N.E.2d 382. In our judgment, these cases are controlling, and they establish that, although GE was guilty of active negligence in the instant case, RDF's negligence was also active.

*Topel* involved a freight elevator accident in a building occupied by Price Brothers, Inc., under a lease from Porter Realty Trust. Price Brothers had had a maintenance contract for the elevator with the Otis Elevator Company, but the agreement was cancelled six months prior to the accident. Shortly before the cancellation, Otis wrote to Price Brothers, recommending a test of the elevator's safety device. The letter stated that it was advisable to perform such tests annually, and that no such test had been performed for a year. Price Brothers did not arrange for such a test.

Three months after the cancellation of its maintenance contract with Otis, Price Brothers made arrangements with Westinghouse Electric Corporation to repair the elevator's drum. Employees of Westinghouse arrived to do the work three months later. In the course of repairing the drum, the employees secured the elevator on the fifth floor by means of a sling. While two of the employees were standing in the elevator the sling broke, and the elevator fell to the ground. The safety device, which would otherwise have prevented the fall, malfunctioned. Evidence was presented to the effect that Westinghouse was negligent in not requiring its employes to take additional precautions in securing the elevator on the fifth floor.

The injured employees sued Price Brothers to recover damages for their injuries, and Price Brothers brought a third-party action for indemnity against Westinghouse. Following a jury trial, the employees were awarded damages in their action against Price Brothers, and Westinghouse was required to indemnify Price Brothers. On appeal, the appellate court affirmed the award in favor of the employees and against Price Brothers, but reversed the judgment in the third-party action, holding that the negligence of Price Brothers was active. In support of this conclusion the court noted that Price Brothers supplied Westinghouse and its employees with an unsafe place to work and did not warn them of the possible dangers. The court also noted that Price Brothers had been explicitly informed of the need for a test of the safety device but failed to have it performed.

■ Similarly, in the instant case RDF had been informed of the need to "[w]ipe and vacuum clean the busses and supports" annually. It did not do so for 10 years despite the fact that, as stated by RDF's plant engineer, it was obvious that an accumulation of dust in the bus compartments would give rise to the possibility of an explosion caused by an arc. As a result, RDF provided GE and its employees with an

unsafe place to work. Under *Topel* such negligence is active. There is ample evidence that GE was also guilty of active negligence. As in *Topel*, there was evidence that the third-party defendant should have taken additional precautions to protect its employees while they worked on the machinery. The jury could also have concluded that GE should not have recommended the AKD-5 Powermaster switchgear to be used in the compressor room at RDF's plant. As noted above, however, a party guilty of active negligence may not recover indemnity whether the other tortfeasor's negligence was passive or active. *Carver v. Grossman* (1973), 55 Ill. 2d 507, 305 N.E.2d 161.

RDF disputes that the GE manual informed it of the need to wipe and vacuum clean the busses and supports annually. In support of this contention RDF refers to the following testimony of Professor Frank:

"Q. *** It [the manual] says 'An annual check and overall maintenance procedure for the switchgear devices and all connections, must be followed as a minimum requirement.' What do you understand the words 'an annual check' to mean in that context?

A. That is to see that the equipment is operational; that is, you go through the circuit breakers, you flip them on and off and see that they work. ***."

Based on this testimony, RDF maintains that it was instructed only to check the circuit breakers annually. This argument overlooks the fact that Frank was only asked the meaning of the term "an annual check." The manual stated that "[a]n annual check *and overall maintenance procedure* for the switchgear devices and all connections, must be followed as a minimum requirement." (Emphasis added.) Moreover, as noted above, below this statement specific maintenance procedures were listed for the different compartments of the switchgear. Under the heading "BUS COMPARTMENT," the manual stated, among other things, "Wipe and vacuum clean the busses and supports."

RDF notes that in *Topel* the court stated that the third-party defendant's duty to perform the work safely did not include the responsibility of checking the safety device. (95 Ill. App. 2d 315, 330.) In the instant case, however, GE was under a duty to inspect and clean the switchgear, and a proper inspection would have revealed the danger. RDF maintains that this distinction between *Topel* and the instant case indicates that its negligence was passive. We disagree. The distinction only involves the degree of culpability of the third-party defendant. At issue here is the nature of the negligence of the third-party plaintiff, RDF, and *Topel* establishes that it was active.

Our conclusion in this regard is reinforced by the other case relied on by GE, *General Telephone Co. v. New Berlin Transit, Inc.* (1984), 126 Ill. App. 3d 698, 467 N.E.2d 382. In that case the negligence of the third-party plaintiff, General Telephone, consisted of a failure to maintain certain telephone wire over a public street at a height of 18 feet. George Felty, who was employed as an electrical lineman for the N. G. Gilbert Corporation for the purpose of raising the wire, was injured when an oil circuit breaker which was being transported by truck, and upon which Felty was riding, collided with the telephone wire. Felty obtained a judgment against General Telephone and certain other parties, and General Telephone filed a third-party complaint against N. G. Gilbert Corporation and the other defendants in the original action. In its complaint, General Telephone alleged that N. G. Gilbert and the others supervised and directed the work involved when Felty was injured, and that the negligence of General Telephone was passive. The trial court dismissed the third-party complaint, and General Telephone appealed. The appellate court affirmed the dismissal, concluding that the failure on the part of General Telephone to maintain the wire at a sufficient height was active negligence. It is noteworthy that the injured party in *General Telephone,* like Mazanek in the instant case, was employed by the third-party defendant to remedy the condition which had become hazardous as a result of the negligence of the third-party plaintiff. Such facts do not convert what would otherwise be active negligence on the part of the third-party plaintiff into passive negligence. Under both *Topel* and *General Telephone,* RDF was guilty of active negligence. See also *Jackson v. Burlington Northern, Inc.* (1980), 84 Ill. App. 3d 967, 405 N.E.2d 805.

The cases cited by RDF do not support a different conclusion. Several of the cases involve liability under the Structural Work Act for negligent construction of scaffolds. In those cases the negligence of the general contractor that failed to discover the defect was held to be passive as against the subcontractor that actually provided the laborers with the defective scaffold. (See, *e.g., Gadd v. John Hancock Mutual Life Insurance Co.* (1971), 5 Ill. App. 3d 152, 275 N.E.2d 285.) Those cases are distinguishable, because in the instant case RDF was not simply guilty of failing to discover a hazardous condition created by another party. The evidence shows that RDF's negligence in failing for 10 years to clean the switchgear annually, as required by the manual, acted to create the hazardous condition.

RDF also relies on the case of *Simmons v. Union Electric Co.* (1984), 121 Ill. App. 3d 743, 460 N.E.2d 28, which was recently af-

firmed by our supreme court in *Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444. Simmons was also a case under the Structural Work Act, but it did not involve negligent construction of a scaffold. In *Simmons* the laborer was injured in a power plant owned by Union Electric Company when he fell from a ladder which had become covered with oil as a result of flooded conditions. The injured laborer had been sent to the plant by his employer, Sachs Electric Company, to remedy those conditions. Sachs was responsible for supervising the work of the injured laborer. A contract between Union Electric and Sachs required Sachs to take all appropriate safety precautions necessary or advisable for the prevention of accidents. Based on these facts, our supreme court concluded that Sachs' failures were active when compared to Union Electric's limited passive role. While there are similarities between *Simmons* and the instant case, there is a fundamental difference which we believe is controlling. In *Simmons* the liability of the passive tortfeasor under the Structural Work Act was based on the fact that it knew or should have known that the ladder was unsafe. It was not based on the theory that its negligence created the hazardous condition. In this respect, *Simmons* is like the other Structural Work Act cases discussed above. In the instant case RDF's negligence acted to create the dangerous condition, and *Topel* and *General Telephone* establish that such negligence is active.

It is our view that the evidence in the instant case, when viewed in its aspect most favorable to RDF, so overwhelmingly establishes that RDF was guilty of active negligence that no contrary verdict could ever stand. Accordingly, we reverse the judgment of the circuit court of Winnebago County, and remand this cause with directions that judgment *n.o.v.* be entered in favor of GE. See *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

Reversed and remanded with directions.

HOPF and STROUSE, JJ., concur.