FRANK GATTO, individually and as Admr. of the Estate of SOPHIE GATTO, Deceased, Plaintiff-Appellee, v. AL M. CURTIS et al., Defendants and Third-Party Plaintiffs-Appellees—(CALUMET FLEXICORE CORPORATION, Third-Party Defendant-Appellant.)

(No. 54730;

First District—June 26, 1972.

*Rehearing denied August 3, 1972.*

A. R. Peterson, Irving G. Swenson, Thomas K. Peterson, and John W. McCullough, all of Chicago, (Peterson, Lowry, Rall, Barber & Ross, of counsel,) for appellant.

Moriarty, Rose & Hultquist, of Chicago, (Maurice James Moriarty, Robert C. Hultquist, and Francis W. Bauer, of counsel,) for appellee.

Mr. PRESIDING JUSTICE GOLDBERG deivered the opinion of the court:

A long and complicated record brings before this court the appeal of Calumet Flexicore Corporation (Calumet). The action was brought by Sophie Gatto for personal injuries and also by her husband, Frank Gatto, for loss of consortium. The third plaintiff is their granddaughter, Janice Boger, then a minor, who sued for personal injuries. These persons will be collectively referred to as plaintiffs. The cause of action arose on

June 19, 1964. Sophie Gatto and Janice Boger were customers in a drug store when a portion of the roof collapsed.

A number of defendants and third party defendants appear in this record. It is not necessary to enumerate them all. One defendant was the partnership of Paul Greenfield, Phillip Zelkowitz and Sol Harris, together with Al M. Curtis, Louis David Friedman and Albert Marks, doing business as Curtis, Friedman and Marks, who will be collectively referred to as the Lessors. They were owners of the beneficial interest in a land trust which held legal title to the property in question. Another defendant was Clifford J. Wood, who was active in construction of the shopping center project of which the drug store was a part. Calumet was joined as third party defendant to a counterclaim filed by the Lessors. Calumet was also made defendant in an amended complaint filed in behalf of Janice Boger.

After a lengthy jury trial, verdicts were returned against the Lessors and in favor of Sophie Gatto for $100,000 and Frank Gatto for $20,000. In addition, a verdict was returned in favor of the Lessors on their counterclaim and against Calumet as third party defendant in the amount of $120,000. There was also a verdict against all three plaintiffs and in favor of Louis Sladky, the drug store operator, and Clifford J. Wood. Another verdict was returned against Janice Boger, the minor plaintiff, in favor of Louis Sladky, the Lessors, Clifford J. Wood and Calumet. Verdict was also returned in favor of the Lessors and against Clifford J. Wood on the counterclaim of the Lessors in the sum of $120,000.

After hearing extensive arguments upon extended post-trial motions, the court entered judgment on the verdicts in favor of Sophie Gatto and Frank Gatto against the Lessors and also in favor of the Lessors against Calumet. The court set aside the verdict in favor of Lessors and against Clifford J. Wood, individually. The court granted a new trial to the minor plaintiff as against the Lessors, Clifford J. Wood, individually, and Calumet. Calumet has appealed to this court from the judgment entered against it in favor of the Lessors. In addition, Calumet has filed in this court a petition for leave to appeal from the order granting the new trial to the minor plaintiff. (Supreme Court Rule 306, 43 Ill.2d R. 306.) An answer to this petition has been filed by the minor plaintiff. These proceedings bear General Number 54613.

During the pendency of the appeal, on January 17, 1970, Sophie Gatto died intestate. On January 27, 1970, the Lessors assigned the judgment recovered by them against Calumet as third party defendant, to plaintiffs Frank Gatto and Sophie Gatto. Thereafter, Frank Gatto was appointed administrator of Sophie Gatto's estate. The parties to the

assignment agreed that if the judgment against Calumet is affirmed on appeal, the sum of $60,000 from the proceeds thereof would be paid to the Lessors together with one-half of the expenses on appeal. In addition, a substitution of attorneys was made so that the Lessors are now represented in this court by counsel for the plaintiffs.

In this appeal, Calumet contends that the judgments in favor of Sophie and Frank Gatto were against the manifest weight of the evidence and that the trial court should have directed verdicts for defendants, including Calumet. In addition, numerous alleged trial errors are cited: 1) that improper conduct of plaintiffs' counsel and of the court denied Calumet a fair trial; 2) that the court erred in ruling on testimony in disqualification of a witness and in improperly curtailing cross-examination by Calumet's attorney; 3) that the court erred in permitting testimony by an expert not previously disclosed by plaintiffs; 4) that the court also erred in improper exclusion of a weather report and 5) in refusing to sever certain claims. The final contention rests upon allegedly improper closing argument by opposing counsel to the jury. A factual statement is required for consideration of the first point.

The record presents a difficult situation. Some of the testimony was given by experts in building and engineering and was extremely technical. These factors added to the problems which confronted the trial court and the jury. The drug store in question was operated under an agency affiliation with the Walgreen chain by Louis Sladky, one of the defendants. He had a written lease to the store premises executed in April, 1961, and expiring in June of 1966.

The store is one unit in a group referred to as the Ridgewood Shopping Center located in the Village of Worth, south of the City of Chicago. The shopping center fronts upon 111th Street and consists of one building to the east of New England Avenue and other structures to the west. We are concerned with the structure located on the southeast corner of New England Avenue and 111th Street facing north. This single store building has a frontage of from 150 to 175 feet on 111th Street and extends back south some 70 to 75 feet on New England Avenue. The building is of brick construction and houses three stores. The Sladky store is farthest to the west, occupying a corner area, some 40 to 50 feet in width. There are two other retail stores located to the east, all within the single structure.

The outside or western wall was 12 inches thick. There was a space of 15 feet four inches from the west wall to a row of so-called lally columns. The west wall extended up to a steel "I" beam which was ten feet six inches above the floor, resting directly upon the top of the brick wall. These beams consist of heavy steel fabricated into two

horizontal flanges, each some 14 inches wide, and a vertical member known as a web. A cross section of this beam presents the letter "I". The steel beam extended back some 18 feet in a southerly direction from the store front. There was a similar steel beam to the east supported by the lally columns. There was a distance of 15 feet four inches from the outside of the west brick wall to the center of the lally columns. These columns were made of hollow steel four inches in diameter and rested upon concrete footings and pads.

The material in the flange of the steel beam on the west wall was three-eighths of an inch thick and each flange was six and three fourths inches in depth upon both sides of the web. This was referred to as a 30 pound beam, being the weight of each linear foot. The beam to the east, resting on the columns, also had flanges six and three fourths inches wide on each side of the web but one-half inch thick so that the beam was referred to as a 38 pound beam.

The roof was made by placing Flexicore units in an easterly and westerly direction between the two "I" beams. It is agreed that these slabs were manufactured and installed by Calumet. They were 16 inches wide by eight inches thick and 14 feet ten inches in length. Each slab weighed from 1100 to 1200 pounds. They were manufactured with hollow cores and had steel rods incorporated within them for reinforcement. Use of these slabs is a quick and economical building construction method. When installed, the slabs are grouted or fastened together with a thin layer of plaster. Thus, the lower surface of the slabs forms the ceiling of the store, to which lighting and other fixtures may be affixed, and the upper surface forms a substantial foundation for the roof. In this construction, as in other similar projects, insulation was set upon the top of the slabs and this was followed by tar paper so that the roof could be formed. For this reason, the roof was flat, without pitch. The possibility of a slant downward to the south was rejected because it might have resulted in a tunnel-like effect in the interior of the store.

Along the west side of the building, the brick wall was built some 12 inches above the roof to form a parapet wall. This wall rested upon the top of the westernmost "I" beam and was covered with stone coping. That portion of the parapet located on the western edge of the building, and toward the northern line thereof, extended upward and form a superstructure 16 inches in thickness, measured from east to west, and seven feet in length, from north to south. The plans showed this pylon as 12 feet tall above the parapet itself and perhaps 13 feet including the coping. However, the stone mason subcontractor testified that, as completed, the pylon was "a couple of feet" shorter. Opposing counsel differ

as to whether this structure should be referred to as a "parapet" or a "pylon." We have some doubts as to which designation is technically more appropriate. Simply for ease of reference, we will use the term "pylon."

The architectural plans for the shopping center originally showed the pylon designed with apertures extending throughout its thickness from east to west. However, these holes were eliminated in construction so that the structure could be used for a display sign for the Ridgewood Shopping Center. The mason subcontractor testified that these holes were eliminated at the direction of Clifford J. Wood. He stated that these openings were unnecessary as the pylon was so heavy and strong as "to break the wind resistance." The pylon was "tied together with bricks and headers." The "headers" are bricks turned on end to add to the structural strength. The pylon was built of cement block, with Roman brick finish. The mason subcontractor testified that in the construction 840 bricks were used at a weight of 4.2 pounds each, making a total weight of approximately 3500 pounds. It was capped with two pieces of stone coping each weighing some 200 pounds. The brick was bonded together with the usual mortar, which added to the weight by an additional 1500 or 2000 pounds. Also, there were 80 cement blocks within the pylon weighing 32 pounds each, being a total of 2560 pounds. This made a total weight somewhat in excess of 8000 pounds. The whole pylon was built upon a 12 inch wall which, according to the testimony of the experienced mason, would support it up to a height of from 35 to 40 feet. There were also some chimneys on top of the parapet wall toward the rear of the building. They rose some six or seven feet above the parapet. They were constructed of brick, four inches thick and each chimney would weigh only about one-eighth as much as the pylon.

A substantial issue arises with reference to the details of installation of the Flexicore slabs. This shopping center was built during 1956 and was ready for occupancy about November of that year. An individual named Clifford J. Wood was very active in construction of the project. Ridgewood Shopping Center, Inc., a corporation, was organized by Wood. In addition, some of the construction activities were carried out by another corporation in which Wood was active, known as Clifford J. Wood, Inc. This corporation was also the carpenter and cement subcontractor. The evidence is conflicing as to whether the general contractor was Ridgewood Shopping Center, Inc., a corporation, or Clifford J. Wood, Inc. Wood owned stock in and was president of both corporations. Plans for the building were drawn by a firm of architects. These are the plans above referred to showing the openings in the pylon which were eliminated. Calumet was retained to manufacture and install the

Flexicore units and another firm was given the subcontract for the roof.

The architectural plans showed the Flexicore slabs installed so as to rest on the upper flanges or top horizontal surfaces of both "I" beams. However, the shop drawings made by Calumet for this installation showed the Flexicore units as resting upon the lower flanges of the "I" beams and they were actually installed in that manner. These beams have a curvature of the surface where the vertical member, or the web, meets the horizontal flanges. Consequently, this method of installation would reduce the size of the bearing surface of the Flexicore units as they rested upon the steel. No direction or order was given to Calumet for this variance from the original plans. It does not appear that this modification was the subject of consultation or discussion between any agent of Calumet and any agent of the architect. Wood testified generally that the Flexicore was installed on the lower flange of the "I" beam on the west wall. He did not testify to any conversation regarding this with any agent of Calumet. It does not appear that this installation was ever specifically noted as a deviation from the architectural plans by any person other than the Calumet personnel until after the events which culminated in the bringing of this suit.

On June 19, 1964, at about 7:30 P.M., the late Sophie Gatto and Janice Boger, her granddaughter, were in the Sladky Drug Store as customers. It was raining heavily and the wind was quite strong. Suddenly, without warning, the lights in the store went out and simultaneously the roof collapsed causing injury to both. It appeared later that 11 of the Flexicore members had become detached from the beam at the eastern edge of the store and had fallen so that they remained propped up against the western wall. In addition, the pylon, or upper portion of the parapet wall, had collapsed onto the roof. The precise cause of this event and the order in which the pylon collapsed and the Flexicore units fell were the subject of lengthy and detailed expert testimony and opinions and acrimonious and sometimes antagonistic argument and wrangling between the attorneys. Other evidence must be noted before we attempt to analyze the expert testimony.

Lessors were the owners and operators of the Ridgewood Shopping Center on June 19, 1964, when the mishap occurred. They acquired their interest in the property in November of 1959, some three years after the buildings had been erected. One member of this group, a practicing attorney, testified that he inspected the property about two weeks prior to its acquisition. This was not a technical inspection but consisted primarily of a visit to every tenant including the operator of the Sladky Drug Store. At that time, a conversation took place with reference to the need of paving repairs to the parking lot but no other

comment was made to the prospective owned by Sladky or any other tenant regarding the condition of the roof.

The written lease covering the drug store in question specifically gave the lessor free access to the demised premises for the purpose of making necessary repairs or alterations as the lessor might see fit but the lessee waived liability of the lessor for damage or injury occasioned by failure of the lessor to keep the premises in repair.

There is substantial evidence that the roof of the premises as originally installed was subject to leakage. As with other matters presented by this record, the precise cause of the leakage is difficult to establish. There is evidence that the installation of the Flexicore slabs on the interior of the west "I" beam, instead of on the top of the beam, left an elevation or hump as the top of the beam protruded along its entire length above the outer surface of the Flexicore units. This made installation of the watertight roofing material more difficult. There is also evidence that the balance of the roof leaked from time to time. Plaintiff attempted to accentuate this condition by proof that water leaked down into the drug store to such an extent that it was necessary to catch it in various containers. There is evidence that water accumulated on the roof to an extent described as "ponding." This may have been caused in part by the flat condition of the roof, which had no slant or pitch. Consequently, water tended to accumulate upon the surface rather than to run off into the rain gutters provided.

There is also evidence that the roof was repeatedly repaired within the five year period of the warranty given by the original roofing subcontractor and that the need for such repairs continued thereafter. In addition, there is testimony that the difference between the level of the Flexicore units and the top of the "I" beam on the west wall created a difficult condition which caused leakage along the entire length of the beam so that rainwater seeped through the roofing material and on to the beam itself, causing a condition of rust and corrosion. The evidence is that a watermark was visible along the length of this "I" beam and that water thus seeped through and into the hollow cores of the Flexicore units.

The roofing contractor who had originally installed the roof testified that it consisted of one-half inch of a rigid insulation material, or insulating board, applied over the tops of the Flexicore units after grouting. Above this there was a four-ply roof of tar and gravel. At the north end of the project, the roof extended out over the sidewalk to form a canopy. A metal stop, referred to as a gavel stop, was installed along the north edge of the roof to prevent water from flowing over this edge and onto the sidewalk below. The roofing subcontractor was called to return

to the job upon several occasions for various reasons. Some of the calls concerned leaks. In addition, the testimony is that the roofer was called back for the purpose of boxing in the upper areas of the steel "I" beams which extended above the Flexicore units. As the roof had initially been completed, the top flanges of the various "I" beams were exposed. These beams were covered with wooden boxes or covers and roofing was installed above this wood. The roofer testified that this work was in addition to his original contract and that he received extra compensation for this.

Other visits by him to the building were necessitated by the fact that the roof had a tendency to retain puddles of water. This witness observed marks along the lower area of the pylon wall at the west edge of the building which showed, in his opinion, that water had accumulated in that area from time to time. These marks extended along the entire pylon wall and well beyond it to the south. The Lessors had ample notice concerning this condition of the roof. When the Lessors purchased the property, they called the roofer concerning leaks. The roofer advised them that his guarantee period had expired and that there was a need for structural changes of the roof. He testified that at times water had accumulated on the roof to a depth of four inches. Upon objection made by counsel for Calumet, the court instructed the jury to disregard this conversation with reference to Calumet. In addition, some repairs to the roof were made with knowledge of the Lessors and their representative.

Another consideration brought forward was weather conditions at the time of the occurrence. Plaintiff called a consulting meteorologist. He testified that there are two so-called Class A weather stations in the City of Chicago and one in Glenview, not far from the city limits of Chicago. The Chicago area stations are located at O'Hare and Midway Airports. The closest station to the Ridgewood Shopping Center is at Midway Airport some six and one-half miles away.

The expert testified that, after study of pertinent data, he found that a line of thunderstorms had passed across the Chicago area on the evening of June 19, 1964. This made possible a wide variation in wind velocities at various points in the area. Official instruments at Midway Airport indicated peak wind velocity at 40 miles per hour and the instruments at O'Hare Field recorded a top velocity of 30 miles per hour on the day in question. The witness stated that it would be impossible to determine the exact peak velocity of the wind at the shopping center for that day without having had proper instruments at the precise point. This witness also testified that study of the official weather records and wind gust data developed at Midway Airport for the past 19 years

showed that the wind rose to gusts of 40 miles per hour on 14 days; to 50 miles per hour on five days; to 55 miles per hour on slightly more than two days per year and 60 miles per hour on slightly over one day per year. We will next proceed to state the conflicting theories of the various expert witnesses.

Leonard LeClaire was called for adverse examination by the plaintiff. He had been employed by Nordlie & Company as an architectural draftsman for more than 40 years. He had prepared the detailed plans for construction of the shopping center. The witness worked under the supervision of a licensed engineer who actually designed the building. This engineer had died prior to the trial. The architectural firm did not prepare specifications but only the plans. After completion, the plans were initialled by the engineer and by the witness. Upon examination of the plans, this witness testified that they provided for installation of the Flexicore slabs on the upper surface of the top flange of the "I" beams. The witness testified that in his opinion the bearing surface would be increased by installing the Flexicore slabs on the top of the beam rather than upon the surface of the lower flange.

The witness further testified that the drawings showed a brick pylon which would be about 15 feet in height above the roof line. The openings were noted thereon as a safety precaution to reduce wind resistance. The witness also testified that the architectural firm by which he was employed was not retained for purposes of supervision and did not actually supervise construction. Therefore, he stated that the firm would have no responsibility with reference to departure from the plans such as elimination of the apertures in the pylon or concerning changes in the method of installing the Fexicore slabs as evidenced by the shop drawings prepared by Calumet.

Regarding installation of the Flexicore, the witness testified that the customary manner would be to install the Flexicore on top of the beam. This method would secure a larger bearing surface equivalent to "about fractions of an inch" for contact between the Flexicore itself and the supporting beam. In addition, the structure above the Flexicore would then rest directly upon it and this would assist in holding the slabs in place. The mortar in the bricks comprising the roof parapet and the pylon above it would be bonded directly to the Flexicore and this would serve to strengthen the structure. The testimony was that the mortar and brick would not bond as well to the steel beam as they would to the Flexicore slabs. The witness further testified in this regard that the reinforcing steel rods in the Flexicore could be exposed and welded to the beam which would also serve to strengthen the structure.

Joseph Partoll was the mason subcontractor for the project. He was

called by plaintiffs for adverse examination. He received a set of the blueprints from Clifford J. Wood. This witness testified with reference to the reduction of height of the pylon wall and the elimination of the apertures. He testified that these things were done by orders of the general contractor. The plans which he received were, in his opinion, adequate to enable him to proceed with performance of his subcontract. This witness testified that both brick and mortar are water absorbent and that this quality gave rise to the possibility of damage to the masonry in the event of freezing of water. In his opinion, the continual leakage in the roof, particularly in the area of the west wall, would have an effect on the brick and mortar in the pylon and in its supporting parapet wall, particularly on the east side of the west wall, which was immediately adjacent to the roof. Water could seep in from this portion of the roof and then run down the inside of the west wall of the structure. This witness testified that he has worked with Flexicore slabs for 22 years; and, in the majority of instances, the Flexicore is installed upon the top of the upper flange of the beam and not upon the lower flange. This method provides more bearing for the steel as the entire width of the upper flange, being three and one-half inches, may be used as a bearing surface for support of the Flexicore slab.

The witness examined a photograph of the steel beam on the west wall and identified whitish marks running along the beam which could have been caused by the infiltration of water. In addition, he identified dark areas on some of the brick left at the base of the pylon after its fall, which could have been caused by the seepage of water. The witness also examined a photograph of the fracture point of the west wall taken after the pylon fell. He testified that if the wall had been blown over by the force of wind (without any intervening cause) the break or separation would have presented a step down effect in accordance with the pattern in which the bricks were laid. However, the wall in question presented a straight and even breaking point. In the opinion of the witness, the accumulation and seepage of water at the immediate eastern point of the pylon wall could have weakened the mortar at the point of fracture so as to cause collapse.

George Kennedy testified as a witness for Louis Sladky, the tenant and operator of the drug store. This witness is a structural engineer of long experience and with excellent qualifications. He examined the plans and other data pertaining to the structure and made a number of calculations. He had reviewed the National Building Code 1955 edition and the City of Chicago Building Code. In his opinion, the pylon was required by the National Building Code to be designed to withstand a wind pressure of 17 pounds per square foot. Actually, according to his

computations, it could only withstand a maximum wind pressure of 14 pounds per square foot. He further testified that installation of the Flexicore on the lower flange of the beam tended to deprive the beam of lateral support and would tend to make it more susceptible to lateral movement. On the other hand, placing the Flexicore on top of the beam would strengthen it against wobbling, moving or twisting out of position and would enable it to withstand much larger loads. In addition, according to the plans as prepared by the architectural firm, the Flexicore slabs would rest upon the entire width of the top flange of the beam or six and three-quarters inches. Installation of the Flexicore upon the lower flange would reduce the maximum bearing surface upon the steel to two and three-eighths inches. The witness quoted from a manual issued by Calumet in 1953 which recommended a bearing surface of three inches as a minimum and use of a smaller surface only if care was used to obtain proper lateral stability. A later manual issued in 1965 specified that a minimum of two inches of bearing could be used with proper caution. A dispute between counsel arose during the testimony of this witness concerning whether or not, in arriving at his opinion, he had used the manual issued by Calumet in 1953 or the one issued in 1965. However, the witness testified that, regardless of which manual had been used, the applicable basis principles of lateral stability would be the same and the same result would follow.

The witness also testified that the seepage of water through the roof constituted another danger to the structure. This water would eventually find its way through the open cores of the Flexicore slabs. This, in turn, would cause a bowing action which would tend to make the slabs bend in or sink at their center portions. Also, accumulation or ponding of water on the roof would augment the bowing effect. In his opinion, these factors together tended to shorten or pull away the Flexicore slabs. The west end of the slabs were held in place by the weight of the parapet and pylon so that the east ends of 11 of them, immediately above the lally columns, were caused to slip from the lower flange of the east beam. In his opinion, this could have been averted by proper installation of the Flexicore upon the tops of both beams. If this had been done, the slabs installed to form the roof could have been 15 feet three inches long instead of 14 feet ten inches as actually installed.

The witness further stated that as these Flexicore slabs became detached, the result was a lifting up of the west wall which would have the effect of cracking off the entire pylon. This would become more possible because of water seeping in at the base of the pylon wall which, with alternate freezing and thawing, would create a fracture at the base of the wall. The witness further theorized that if the mishap had been

caused simply by the collapse and fall of the pylon wall, its weight might have broken the Flexicore slabs in an area near their center.

Jack Janney was called as a witness by Calumet. He too is a highly qualified expert in structural engineering with an excellent educational background and long experience. He testified that the wall in question above the roof should be defined as a parapet and not a pylon. He cited the American Standard Building Code requirements for masonry as authority for this opinion. This source stated that parapet walls should be at least eight inches thick and their heights should not exceed three times the thickness. The witness calculated, and accordingly testified, that a masonry wall which was 16 inches thick, seven feet wide and 12 feet high would be expected to fall as a result of a steady wind velocity of approximately 40 miles per hour. The pylon wall on this building did not fall at an earlier time merely because wind of this velocity was not coming from the precise direction required to cause the collapse. Also, the wall, when new, would have been able to withstand a greater wind velocity.

The witness further testified that since the Flexicore slabs were made of concrete, the presence of water would tend only to strengthen them. However, he expressed the opinion that leaks in the roof, which permitted seepage of water to the steel "I" beams, would cause rust and corrosion of the metal. This in turn could have caused enough pressure against the mortar embodied in the base of the pylon to cause it to crack. The witness testified that the failure of the wall had taken place along the mortar joint and was not caused by a fracture of the bricks.

This witness was of the opinion that the actual weight of water accumulating upon the roof would have no effect. In his opinion, the Flexicore slabs were sufficient to withstand water approximately three feet deep. Eights inches of water on the entire roof, however, would have caused a load of 40 pounds per square foot upon the Flexicore and this, in turn, would cause a deflection of three-eighths of an inch in each slab.

Mr. Janney minimized the opinion stated by the expert Mr. Kennedy concerning lack of lateral stability. His theory was that installation of the Flexicore slabs on top of the beam would not provide such stability. The only problem regarding lateral stability would occur during construction; but, once the heavy slabs had been installed, they would give the structure sufficient lateral stability whether they rested upon the top or the bottom flange of the steel beams. In his opinion, the failure of these slabs occurred only because of an impact load. This resulted from the toppling of the pylon by the wind which caused a heavy impact at the eastern end of the slabs. The witness also stated that there

was no evidence of rotation of the steel beams. Upon inspection of the site and examination of photographs he found no cracking of the paint on the bottom surface of the slabs or on the bottom of the "I" beams and no evidence of deflection or distortion of the beams such as would have resulted from rotation. He testified that the line along the length of the western "I" beam, observed from a photograph, was not evidence of water seepage but showed only the result of the grouting of the slabs.

■■ It is apparent from the above that a number of conflicting theories were expressed to the jury regarding the cause of the injuries suffered by plaintiffs. If the trier of fact reasoned from the assumption that the leakage of water from the roof weakened the pylon wall and, combined with seepage into the hollow portions of the Flexicore, made the roof structure defective and unsafe, it would follow logically that the Lessors were guilty of negligence in knowingly maintaining the unsafe condition and in failing to repair the defects. In our opinion, this conclusion is amply supported by the evidence and, therefore, the verdicts in favor of plaintiffs and against the Lessors, having been approved by the trial court, are not contrary to the manifest weight of the evidence. The evidence is ample here to show the defective condition and to show notice thereof to the Lessors. Under these circumstances, in view of the covenants of the lease pertaining to repair of the roof, the Lessors would be liable for the injuries sustained by plaintiffs. (*Carson v. Weston Hotel Corp.*, 351 Ill.App. 523, 531, 115 N.E.2d 800.) In fact, the doctrine of *res ipsa loquitur* has frequently been applied to situations such as presented by the case at bar. (See *McCleod v. Nel-Co Corp.*, 350 Ill.App. 216, 223, 112 N.E.2d 501 and also *Drewick v. Interstate Terminals, Inc.*, 42 Ill.2d 345, 247 N.E.2d 877.) Concerning the liability of an owner to an invitee, see *Madrazo v. Michaels*, 1 Ill.App.3d 583.

■■ As regards the third party issues between the Lessors and Calumet, a jury of fair and reasonable persons could readily have found from all the evidence that Calumet willfully deviated from the architectural plans furnished to it and installed the Flexicore slabs on the lower inner flanges of the steel beams rather than upon the tops thereof and that this type of installation was the proximate cause of the collapse of the roof. The current legal definition of the phrase "willful and wanton" may also include an error of judgment under proper circumstances. (*Clifford v. Schaefer*, 105 Ill.App.2d 233, 243, 245 N.E.2d 49. See also *Moore v. Jewel Tea Co.*, 116 Ill.App.2d 109, 136, 253 N.E.2d 636, affirmed 46 Ill.2d 288, 263 N.E.2d 103.) We will add that under circumstances such as these, the negligence of the Lessors would be passive while that of Calumet would be active. (*Topel v. Porter*, 95 Ill.App.2d 315, 330, 237 N.E.2d 711. See also *Mullins v. Crystal Lake*

*Park Dist.*, 129 Ill.App.2d 288, 231, 262 N.E.2d 622.) Also, an amendment could be made even now to conform the third party complaint to the proof of active negligence of Calumet as contrasted to the passivity of Lessors. (Supreme Court Rule 366(a)(1); 43 Ill.2d Rule 366(a)(1).) In view of all of the evidence, we cannot say that this verdict of willful conduct by Calumet, approved by the court, is contrary to the manifest weight of the evidence.

■■ In a situation such as disclosed by this record, we cannot substitute contrary conclusions for those reached by the trier of fact. The fact that opposing inferences would be equally supported by the evidence is not sufficient to show that these verdicts of the jury are unreasonable. (*Finley v. New York Central R.R.*, 19 Ill.2d 428, 436, 167 N.E.2d 212.) We, therefore, reject the first contention of Calumet that the verdicts in favor of Frank Gatto and the late Sophie Gatto and in favor of the Lessors against Calumet are contrary to the manifest weight of the evidence.

■■ The trial court did not err in refusing to direct verdicts in favor of Lessors and in favor of Calumet. Plaintiff's third amended complaint against the Lessors charged negligence. The second amended third party complaint of Lessors alleged that Calumet willfully deviated from the architectural plans. These were issues for the trier of fact. There is ample evidence in the record to justify both verdicts. Similarly, the trial court did not err in directing verdicts of not guilty in favor of Joseph Partoll (the roofing subcontractor) and Nordlie & Co. (the architectural firm). Application of the now familiar *Pedrick* standard fully justifies all of these rulings by the court. (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504.) The issues regarding liability of the various defendants were different and several. Under these circumstances, Calumet cannot claim that the rulings of the court in favor of other parties constitute reversible error. See *Condon v. Chicago Railways Co.*, 181 Ill.App. 330, 333.

■■ We similarly reject Calumet's claim that the verdict against Janice Boger was inconsistent with the verdicts in favor of plaintiffs so that the latter should be set aside. The verdicts in favor of Sophie and Frank Gatto were approved by the trial court. As shown, we may reverse these judgments only if the verdict is contrary to the manifest weight of the evidence. On the contrary, the trial court saw fit to grant a new trial to plaintiff, Janice Boger, and to set aside the verdict against her. In doing so, the trial judge determined that the verdict was against the weight or preponderance of the evidence. The standards applicable in these two situations are distinctly different. (*Biel v. Wolff*, 126 Ill.App.2d 209, 224, 261 N.E.2d 474; *Skiba v. Ruby*, 113 Ill.App.2d 170,

173, 251 N.E.2d 771; *Heuer v. Goldberg*, 106 Ill.App.2d 55, 61, 245 N.E.2d 497.) We cannot properly say that granting the new trial to plaintiff, Janice Boger, was an abuse of discretion.

We will proceed next with consideration of the trial errors depended upon by Calumet for reversal of the judgment appealed from. We preface this by quoting the following pertinent language from *Foss Park District v. First National Bank of Waukegan*, 125 Ill.App.2d 276, 282, 260 N.E.2d 474:

"The respondents' main thrust in this appeal is alleged errors in the evidentiary rulings. The trial court must be permitted an area of discretion both as to the scope of cross-examination and as to the relevancy of evidence offered to prove a case in chief. Our purpose is not to ascertain that the record is free from all error, but to determine that a just conclusion has been reached, founded upon competent and sufficient evidence, without error that might be prejudicial to a litigant's rights. *Ziegler v. Smith* (1967), 86 Ill.App.2d 215, 224, 229 N.E.2d 340."

Calumet's first contention is that the improper conduct of plaintiffs counsel and of the court caused a denial of its right to a fair trial. In its brief, Calumet cites a number of instances of alleged unfair conduct by the court as well as one instance of alleged accusation made by plaintiff's attorney against counsel for Calumet. In response, counsel for plaintiff has presented a detailed argument in which the position is strongly taken that the fault for these various alleged errors rested upon counsel for Calumet who had harassed the court and opposing counsel with the intention of obtaining a mistrial. Counsel for plaintiff has gone to the extent of counting the number of objections made by counsel for Calumet and by himself and the number of times that the court acted favorably to each side with the stated result that the box scores attained by each of the parties were relatively even.

Reading of the voluminous record shows that the trial judge was indeed confronted with a situation well calculated to try the judicial soul. There were a great many parties in the case, each represented by its own counsel who were, in the main, lawyers of considerable experience and ability. The issues were long, complicated and technical. To make matters worse, there was animosity between certain of the counsel which constantly presented itself and which tended to make discharge of necessary judicial duties a difficult and onerous task. In this type of situation, we will not attempt to assess fault as between various individual counsel. We will merely state that, in our opinion, as disclosed by this record, the trial judge handled himself in a most creditable manner and did the very best that could be expected of any

fair and competent judicial officer in the difficult situations thrust upon him. Concerning conduct of the trial court, we will adhere to the established principle that not every comment or statement made by a trial judge is error despite assertions of counsel to the contrary unless prejudice is clearly shown. (*Johnson v. Cunningham*, 104 Ill.App.2d 406, 412, 244 N.E.2d 205.) We do not find a clear showing of prejudice from this record.

■■■ As regards the issue of alleged improper conduct on the part of opposing counsel, it may well be argued that there was impropriety on both sides. On the other hand, it is charged that this impropriety had its origin in the conduct of counsel who now complains against it. Without seeking to decide this question, we will reason from the premise that this issue regarding impropriety of counsel and its possible effect is best left to the discretion of the trial court. (*Johanneson v. Ring*, 82 Ill.App.2d 340, 350, 226 N.E.2d 291.) The trial court, in a situation of this type, had the best opportunity of determining the effect, if any, of the alleged improprieties. In this case, the court spent a considerable amount of time after verdict and heard extensive arguments upon detailed post-trial motions. He concluded that the trial had been fair and that the verdict was proper. Under these circumstances we cannot find a clear abuse of discretion by the trial court. (*Johnson v. Cunningham*, 104 Ill.App.2d 406, 412, 244 N.E.2d 205.) Upon consideration of all of the contentions of opposing counsel and upon careful reading and study of the various interchanges between court and counsel, we reject the contention that Calumet was deprived of a fair trial by any conduct or statement of opposing counsel or by any statement made by the court.

Calumet contends that it was denied a fair trial by improper closing arguments of opposing counsel. The attorney for plaintiff commented to the jury that certain parties were found not guilty as a matter of law. It is urged that such remarks gave the jury the impression that the remaining defendants, or at least some of them, were considered culpable by the court. Calumet here depends upon *La Salle National Bank v. Wieboldt Stores Inc.*, 60 Ill.App.2d 188, 208 N.E.2d 845. This authority is inapplicable here for these reasons. First, the argument in *La Salle* went far beyond that complained of in the case at bar and actually told the jury that since certain defendants had been dismissed by the court, therefore, the remaining defendants should be found not guilty. Second, in *La Salle* this court found that the order of dismissal granted by the court was erroneous. In the case at bar, we have approved these actions by the trial court. Third, Calumet clearly has not been prejudiced by the assailed argument. The jury returned two verdicts in favor of certain defendants and against plaintiffs.

■■ Calumet further makes the point that the attorney for the Lessors was permitted by the court to comment to the jury twice that Frank and Sophie Gatto did not sue Calumet for a "technical reason." Counsel for plaintiffs repeated that there was a technical reason why plaintiffs had not sued Calumet directly. Calumet urges that these arguments were improper comments upon matters not in evidence and depends upon *Owen v. Willett Truck Leasing Corp.*, 61 Ill.App.2d 395, 209 N.E.2d 868. In *Owen,* the trial court excluded an incompetent report. In final argument, plaintiffs' counsel argued from the contents of this document and used it to supply additional facts and inferences. The case is not applicable here. We find no prejudice to Calumet and no reversible error in the closing arguments of counsel.

■■ Calumet also contends that the court erred in allowing counsel for plaintiffs to question the witness, Leonard LeClaire, by means of leading questions, as on cross-examination. This witness was the draftsman for Nordlie & Company, the architectural firm. Plaintiffs contended that adverse examination of this witness was proper under Section 60 of the Civil Practice Act. (Ill. Rev. Stat. 1967, ch. 110, par. 60.) It appears from the evidence given by the witness that he did not qualify for adverse examination under any of the executive or supervisory categories specified in the statute. (See *Lamberes v. Northern Cartage Co.*, 86 Ill.App.2d 311, 315, 229 N.E.2d 901, 903.) No showing is made by Calumet, however, that this rather technical error was in any way prejudicial or even detrimental to its rights.

■■ Similarly, the claim is made that the court erred in permitting this witness to testify, as though he were an expert, on Flexicore and its uses and also to express opinions on improper issues. The qualifications of this draftsman with 40 years of experience presented a question within the broad discretion of the trial court as to whether he should have been permitted to give opinion testimony. In our opinion, Calumet has failed to show a clear abuse of discretion in connection with the examination of this witness. (*Nicte-Ha v. Teichert,* 119 Ill.App.2d 336, 346, 256 N.E. 2d 140. See also *Galluccio v. The Hertz Corporation,* 1 Ill.App.3d 272, 280, 274 N.E.2d 178.) Furthermore, the modern tendency is to permit expert testimony in complicated matters outside the knowledge or understanding of the average person and even as to matters of common knowledge where there is a difficulty of comprehension and explanation. (*Moren v. Samuel M. Langston Co.,* 96 Ill.App.2d 133, 142, 237 N.E.2d 759; *Weaver v. Lovell,* 128 Ill.App.2d 338, 347, 262 N.E.2d 113.) We find no abuse of discretion in connection with these matters.

■■ Calumet contends that the court improperly restricted its cross-examination of the witness Howard Johnson. This person was inter-

ested in a suit resulting from the same events here involved. In this regard, the ruling of the court was erroneous since the interest of the witness was a proper subject for cross-examination. However, on the day following this ruling, the trial court corrected this situation and stated that the jury should have been informed concerning the interest of the witness by reason of the pendency of the other lawsuit. The court then permitted counsel to stipulate to the facts concerning this matter for the information of the jury. Under these circumstances, any harm or detriment that may have resulted from the error was eliminated.

■■ A rule to exclude witnesses was entered at the commencement of the trial. Calumet called a witness named Jackie Spear. She had not been physically present in the courtroom during the proceedings but counsel for Calumet admittedly read to her certain portions of the testimony, which had previously been transcribed. After a hearing on the matter, the trial court ruled that the witness should be excluded. Enforcement of the rule to exclude witnesses was a matter within the discretion of the trial court. (*People v. Horne,* 110 Ill.App.2d 167, 174, 249 N.E.2d 282, and *Bumblauskas v. South Suburban Safeway Lines,* 110 Ill.App.2d 52, 59, 60, 249 N.E.2d 143.) The court's ruling in this instance was a valid exercise of his discretion.

■■ The next contentions of Calumet revolve about the testimony of the expert witness George Kennedy called by defendant Louis Sladky. The first point raised is that this witness used a manual issued by Calumet having reference to the use of Flexicore in 1965 as a partial basis for his opinion, whereas the construction took place in 1956, so that an earlier manual should properly have been used. We have already discussed this contention and have shown that the date of the manual used made little or no difference in connection with the testimony of this witness.

■■ In addition, Calumet made a motion to strike all of the testimony of the witness Kennedy. He testified that he had used a 1953 edition of the National Building Code and stated on cross-examination that he did not determine whether the Village of Worth had its own building code at the time of construction. This motion was overruled by the court. The witness further testified that he had reviewed the National Building Code, the Uniform Building Code and the Chicago Building Code on the subject of his testimony and that he found no major differences between them. The witness further stated "* * * and when there was any difference, I gave you [Calumet] credit for the best possible result you can come up with." In our opinion, the question of the source material used was but one facet of the expert's testimony. The entire question was one of the weight of his testimony which was for the trier of fact to

determine. The court did not err in overruling the motion to strike his testimony.

■■ Another point is raised by Calumet regarding the contention that this witness had omitted certain sentences from his reading of the 1965 Calumet Manual concerning minimum bearing for Flexicore slabs when used on steel. This alleged omission was fully discussed in the presence of the jury. We believe that they were completely informed upon this point and that the matter of the omission and its significance did not prejudice Calumet. We reach the same conclusions with reference to the contentions that the court permitted this witness to state opinions without a proper hypothetical question and that the witness used assumptions improperly in evidence in arriving at his opinions.

■ Additional contentions made by Calumet are concerned with restrictions of its right to cross-examination of defendant, Joseph Partoll, the masonry subcontractor; and of the defendant, Louis Sladky, the operator of the drug store. We have given careful attention to the claims of error with reference to these matters. In each case, they raise points which were clearly within the discretion of the trial court. We need cite no authorities for recognition of the established proposition that the scope of cross-examination of a witness is singularly within the discretion of the trial court. We find no abuse of discretion here.

Calumet urges reversal on the ground that the court erred in its rulings concerning John R. Murray, an expert witness for plaintiffs. The identity of this witness was first disclosed to Calumet by plaintiffs at the commencement of the trial. At that time, plaintiffs' attorney informed the court that plaintiffs had recently obtained two experts whose identity was previously undisclosed to other parties. Calumet then requested that the court provide sufficient time for interrogation of the witness and preparation of cross-examination. The court responded that Calumet would be given an opportunity to interrogate the witness before he took the stand.

■■ This witness was called two days later. Calumet's attorney requested a hearing upon this subject. The trial court stated that his ruling was that Calumet be given an opportunity to interrogate the witness immediately before his testimony. Calumet requested that it be permitted to take a deposition from this witness. The court, however, ruled that it would permit only prior interrogation by counsel. This procedure was followed and the witness was questioned by Calumet's lawyer prior to his testimony. It will be remembered that this witness testified, in effect, to the contents of a certified weather report regarding wind velocity on the date in question and also to some statistical information regarding average frequency of certain wind velocities in the area. The

trial court had discretionary powers in connection with handling of this situation. This appears from many authorities, including *Wright v. Royse*, 43 Ill.App.2d 267, 193 N.E.2d 340, which is cited and relied upon in the briefs of both sides. Under all of the circumstances shown here, we conclude that there was no abuse of discretion in the ruling of the trial court.

■■ Closely allied to this contention is the question raised by Calumet with reference to introduction of additional evidence concerning weather conditions on the day in question. Calumet claims here that the court improperly excluded certified weather data. This tendered and excluded exhibit contained reference to reports of wind velocity at Ogden Dunes, Indiana, and in the area of Joliet in Will County, Illinois. As shown, the court did permit testimony regarding the wind velocity at the official United States Weather Station in Midway Airport which was the closest to the location in question. Under these circumstances, we believe that the court properly decided the issue of relevance and restricted the testimony to data obtained from the closest weather station. Additional matters as urged by Calumet would have no probative value.

■■ Finally, Calumet asserts reversible error based upon denial of its motions that the claims of plaintiffs be severed and also that the questions of third party liability be severed and deferred until the original case had been decided. A trial court is vested with wide discretion in deciding a motion for the severance of the claims of several plaintiffs. (*Blachek v. City Ice and Fuel Co.*, 311 Ill.App. 1, 35, 35 N.E.2d 416.) In addition, it has been consistently held that the trial court has broad discretion with respect to whether or not a third party action should be severed from the original cause. (*Williams v. Brown Mfg. Co. Inc.*, 93 Ill.App.2d 334, 343, 236 N.E.2d 125; *Wiegel v. One La Salle Co.*, 75 Ill.App.2d 272, 277, 221 N.E.2d 117.) The basic purpose of the applicable statute is to permit joinder of third party claims to avoid multiplicity of suits and to foster speedy termination of litigation. (Ill. Rev. Stat. 1969, ch. 110, par. 25(1) and (2).) The trial court, by virtue of close contact with counsel, acquires a good knowledge of the case and its background and therefore is better equipped than a reviewing court to determine the need for severance to do justice between the parties. We find no abuse of discretion here.

■■ Even though there might well be room for reasonable disagreement with some of the matters above discussed, we cannot find from this entire record that any of these rulings, or all of them combined, were so unfair or prejudicial to Calumet as to require reversal of the judgments appealed from. Lengthy and detailed consideration of all of the contentions arising from this voluminous record, marred in part by undignified

verbal encounters between certain of the counsel and the trial court, impels us to deny the claims of error with the following pertinent quotation from *Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 118, 199 N.E.2d 769:

> "The ultimate question here is not whether the trial was scrupulously free from error, but whether any error occurred which operated to the prejudice of the defendant or unduly affected the outcome below. Considering the evidence which supports the jury's verdict, as well as the law applicable to the alleged trial errors raised here, it is our conclusion that there is no error which would justify a reversal in this case."

We conclude that the verdicts and ensuing judgments in favor of plaintiff Frank Gatto individually and as Administrator against the Lessors and in favor of the Lessors and against Calumet are proper and free from reversible error and said judgments are affirmed.

Judgments affirmed.

BURKE and STAMOS, JJ., concur.