359 S.E.2d 558

**STATE of West Virginia**

v.

**Cora Lynn STEELE.**

No. 16804.

Supreme Court of Appeals of
West Virginia.

May 15, 1987.

Rehearing Denied July 16, 1987.

Silas B. Taylor, Deputy Atty. Gen., Dave Johnson, Asst. Atty. Gen., for appellant.

Arthur T. Ciccarello, Brickford Y. Brown, Charleston, for appellee.

MILLER, Justice:

Cora Lynn Steele was convicted of first degree murder and third degree arson by a Raleigh County jury on March 1, 1984. Upon appeal, she urges three principal grounds for reversal. First, she contends that prejudice resulted when a courtroom observer played a tape recording of in-court testimony to two State witnesses in violation of a witness sequestration order. Second, she alleges that her theory of self-defense was impaired by evidentiary rulings made by the trial court. Specifically, she asserts that the court improperly limited expert testimony regarding the "battered woman's syndrome" and the history of threats and violent behavior directed toward the defendant by the victim. Third, the defendant contests the exclusion of other evidence regarding acts of violence committed by the victim. We hold there is no reversible error and affirm the conviction.

I.

On the morning of August 28, 1982, the defendant shot and killed her ex-husband, Robert O. Arnold, in his automobile while parked on a remote roadway near Beckley, West Virginia. Afterwards, she ignited the interior of the automobile and fled the scene of the shooting on foot.

The State sought to prove that the killing was premeditated by emphasizing the defendant's intimate relationship with the victim and the circumstances of the shooting. Two witnesses testified that the defendant had become romantically involved with Mr. Arnold after their divorce in 1976. The shooting occurred while the two were traveling to Myrtle Beach, South Carolina, on a trip they had apparently planned weeks in advance. Mr. Arnold was shot two or more times in the neck and head while seated in the driver's seat of the automobile. The defendant fired the shots from a small handgun while positioned in the rear seat.

By the defendant's own admission, Mr. Arnold had not taken any overt or aggressive action against her immediately prior to the shooting. It was also shown, both circumstantially and through the testimony of a close friend, that the defendant had taken a can of lighter fluid on the trip which she used to ignite the car.

Evidence was also introduced concerning the defendant's conduct after the shooting which was alleged to be inconsistent with her claim of self-defense. The defendant attempted to destroy the victim's body and the automobile, discarded the weapon, and failed to report the shooting to the authorities. During the police investigation, the defendant initially denied any involvement in the killing. Later, when asked if she would take a polygraph examination, she stated that she knew that she would "get caught" and admitted her participation. During trial, the State also highlighted aspects of her trial testimony, helpful to her self-defense claim, which were absent from her prior statement to the police.

The defendant relied upon a theory of self-defense, which was based substantially on the battered woman's syndrome. In her direct testimony, she related a history of intimidation and threats of violence by the victim which extended over a period of five years. The couple were married in May, 1971, and had a son, David, in October of that year. After learning that her husband was having an extramarital relationship, the defendant confronted him and he vacated the family house.

In August, 1976, the defendant was away on a trip for approximately three days and, upon her return, discovered that her trailer had been vandalized. Though Mr. Arnold denied having taken part, the defendant testified she believed he was the responsible party. She then brought an action for divorce. Mr. Arnold became upset and threatened to burn her trailer if she pursued her plans to obtain a divorce. A divorce was awarded on December 9, 1976, and one month later her trailer was destroyed by fire. A farmhouse into which she moved burned shortly thereafter under suspicious circumstances. The defendant

testified that she believed Mr. Arnold had been instrumental in both arsons, though apparently no charges were brought against him.

Subsequently, the defendant married a Terry Steele. In June, 1978, Mr. Steele was shot through a window at their home. The defendant testified that Mr. Arnold admitted having shot him two years after the incident and vowed he would "finish the job."

In May, 1980, the defendant's house was again consumed in a fire. She testified that after the third house fire, the victim's threats increased. Out of fear of reprisal to herself and to her family, the defendant stated she periodically agreed to meet Mr. Arnold socially in restaurants or at the homes of friends. In July, 1981, she accompanied him on a six-day vacation trip to Myrtle Beach, South Carolina.

It was the defendant's testimony that following further threats from Mr. Arnold, she again agreed to travel to the beach with him the next year. They arranged to meet on the evening of August 27, 1982. When they met, however, she had changed her mind and resolved not to go. Mr. Arnold allegedly grabbed her arm and forced her into his automobile. He began driving southward and departed from what the defendant knew to be the route to the beach. Mr. Arnold spoke with sexual innuendoes and told her that he had a "surprise" for her. On a remote road near Beckley, he stopped the car and instructed her to get into the back seat; she did so. As he turned around, she shot him repeatedly with a handgun she was carrying because "[she] was scared of what he was going to do to [her]."

She testified that after the shooting she realized her fingerprints and hair would be in the automobile and she "didn't want that to be found." While searching the interior of the automobile, she located a container of lighter fluid. She poured the fluid over the front and rear seats, as well as over a bag she was carrying, and ignited it. The defendant then fled the area on foot, removed the shells from her handgun, and threw the gun into a ditch.

Two expert witnesses were called to testify on her behalf. David Walker, M.D., a psychiatrist, had examined the defendant in October, 1977, approximately ten months after her divorce. She was hospitalized for two weeks for observation and treatment of what he described as "an inability to function well." Dr. Walker diagnosed her condition as an anxiety neurosis which, he opined, resulted from a "real-life fear of her situation" with Mr. Arnold.

John C. Litton, Ph.D., a psychologist, examined the defendant in November, 1982, three months after the shooting. He concurred with Dr. Walker's diagnosis of an anxiety neurosis, which he concluded was causally related to the ongoing relationship with Mr. Arnold. Dr. Litton testified that the defendant had a "tremendous amount of residual fear" toward Mr. Arnold. When asked whether such fears were justified, Dr. Litton replied they were. He described their relationship as having been characterized by a long-term pattern of intimidation, and noted that the defendant had "very, very little ability" to resolve her situation. He concluded by observing that the defendant's situation was an exaggeration of the common scenario in which one is "pushed to the wall" and acts violently out of character. The trial court sustained an objection to this last remark as touching upon matters for the jury's determination.

During the third day of testimony, it was learned that Jim Arnold, a brother of the victim, had been recording substantial portions of the testimony. The judge ordered the tape recorder seized and it was returned to him at the conclusion of the trial. On April 19, 1984, six weeks after the verdict was rendered, a lengthy hearing was held during which several witnesses testified that Mr. Arnold had taped the proceedings and apparently replayed the tape to people outside of the courtroom and in the office of the circuit clerk. At the hearing, Mr. Arnold testified that he had asked the private prosecutor if it was permissible to tape the proceedings, and that he was doing so to enable his mother to hear the testimony. He denied having played the tape in the courthouse, but ad-

mitted having played it for a group of friends and family in the library of the private prosecutor's office and in his hotel room.

Two of those who listened to the recorded testimony were called as witnesses on behalf of the State. One such witness was called on rebuttal only; the other had testified before the taping began and was recalled to testify on rebuttal after hearing portions of the tape. Following the hearing, the defendant moved for a new trial and her motion was denied.

## II.

The defendant argues initially that the trial court should have awarded a new trial based on the tape-recording incident. It is her position that such activity was in violation of a witness sequestration order because two of the State's witnesses heard portions of the tape. The claim is made that this resulted in substantial prejudice to her defense. We hold, under the circumstances of this case, that the defendant was not prejudiced by the violation of the order.

## A.

We address at the threshold a question not raised or briefed by the parties, but necessary to our disposition of this case: Whether an order of sequestration prohibits prospective witnesses from listening to a mechanical recording of in-court testimony of other witnesses? It has been recognized by our cases that the purpose of sequestration is to prevent a witness from hearing the testimony of others and having an opportunity to color his own accordingly. *E.g., State v. Banjoman,* 178 W.Va. 311, 359 S.E.2d 331 (1987); *State v. Harriston,* 162 W.Va. 908, 253 S.E.2d 685 (1979); *State v. Wilson,* 157 W.Va. 1036, 207 S.E.2d 174 (1974).

■ Traditionally, our sequestration rule has been phrased as a general prohibition against witnesses being present in the

courtroom during testimony. Quite obviously, as other courts have recognized, the same problem is involved whether witnesses are physically present in the courtroom or are privy to in-court testimony through secondary means, such as by reading daily transcripts of the trial or by listening to a mechanical recording of the testimony. *See, e.g., Harkins v. Ikeda,* 57 Haw. 378, 557 P.2d 788 (1976) (witness read depositions of physicians which were read into evidence); *Triton Oil & Gas Corp. v. E.W. Moran Drilling Co.,* 509 S.W.2d 678 (Tex. Civ.App.1974) (witness read transcribed notes of proceedings taken by observer); *Gatto v. Curtis,* 6 Ill.App.3d 714, 286 N.E.2d 541 (1972) (witness privy to verbatim transcript of testimony); *see generally* 6 J. Wigmore, Evidence § 1840 (Chadbourne rev. 1976). We, therefore, conclude that a witness sequestration order includes a prohibition against prospective witnesses listening to mechanical recordings of the testimony of other witnesses who have given prior testimony.

## B.

■ Whether the undisputed violation of the sequestration order by two State witnesses requires a reversal of the defendant's conviction forms our next inquiry. Under the common law of West Virginia, the question of whether witnesses shall be sequestered during a trial lies within the discretion of the trial court, as stated in Syllabus Point 4 of *State v. Wilson, supra:*

> "The question as to which witnesses may be exempt from a sequestration of witnesses ordered by the court lies within the discretion of the trial court, and unless the trial court acts arbitrarily to the prejudice of the rights of the defendant the exercise of such discretion will not be disturbed on appeal." [1]

Where the court orders a sequestration of witnesses and a witness violates the order, we have held that the violation does not of

---

1. Rule 605 of the West Virginia Rules of Evidence, which governs the exclusion of witnesses, seemingly removes the discretion of the trial court and mandates a sequestration "[a]t the

request of a party." *See* F. Cleckley, Handbook on Evidence for West Virginia Lawyers § 2.1(A) (2d ed. 1986).

itself render the witness incompetent to testify. *State v. Sherman*, 163 W.Va. 767, 260 S.E.2d 287 (1979); *State v. Stewart*, 63 W.Va. 597, 60 S.E. 591 (1908); *Gregg v. State*, 3 W.Va. 705 (1869). The trial judge may, in the exercise of his sound discretion, determine whether the disobedient witness shall be permitted to testify, as we said in Syllabus Point 7 of *State v. Wilson, supra:*

"Where a sequestered witness does not withdraw when ordered, or afterwards returns into the courtroom and is present during the examination of other witnesses, it is discretionary with the judge whether or not he will allow this witness to be examined."

■ The defendant contends that permitting the State witnesses who heard the tape recording to testify at trial was an abuse of discretion. We have not had occasion to discuss the potential error where the trial court allows a witness to testify who has violated a sequestration order. As the defendant suggests, the general rule elsewhere appears to be that where a State witness violates a sequestration order and is permitted to testify, the question on appeal is whether the witness's violation of the order and the ensuing testimony had a prejudicial effect on the defendant's case. *E.g., Partridge v. State*, 431 So.2d 1377 (Ala.Crim.App.1983); *State v. Sowards*, 99 Ariz. 22, 406 P.2d 202 (1965); *Cooley v. State*, 4 Ark.App. 238, 629 S.W.2d 311 (1982); *State v. Ardoin*, 340 So.2d 1362 (La.1976); *State v. Radi*, 176 Mont. 451, 578 P.2d 1169 (1978); *Mothershed v. State*, 578 S.W.2d 96 (Tenn.Crim.App.1978); *see generally*, 2 Wharton's Criminal Evidence § 376 (14th ed. 1986); Annot., 14 A.L.R.3d 16 (1967).

Obviously, where a witness's testimony is unrelated to any taped testimony that he heard, there would not be any prejudice to the defendant's case. The same result would follow if the witness's testimony, given after he had heard taped testimony of others, related to matters that were mainly collateral to the taped testimony.

■ Upon a careful review of the record, we conclude that no prejudice resulted from the admission of the testimony of the two witnesses who heard portions of the tape recording. Kathy Arnold, a sister-in-law of the victim, was not called to testify during the State's case-in-chief. Her testimony on rebuttal dealt exclusively with a conversation she had had with the defendant in which the defendant expressed her love for the victim. The purpose of this testimony can hardly be said to relate in any substantial degree to the defendant's guilt or innocence. We find her testimony not to constitute reversible error.

Joan Arnold, the victim's widow, had testified one day before the taping began. She was recalled during rebuttal and recounted simply that when the police investigated one of the arsons in January, 1977, the victim had denied any involvement. This was essentially the same statement she made in her initial testimony which was given before the taping began. Consequently, the taping had no effect on her testimony and did not result in any prejudice to the defendant.

### III.

We have mentioned the battered woman's syndrome in two previous cases which suggest that, in an appropriate case, evidence regarding the syndrome may be introduced. In *State v. Duell*, 175 W.Va. 233, 332 S.E.2d 246 (1985), the issue centered on an insanity defense in which a psychologist testified to the effect that as a battered woman, the defendant was out of touch with reality. In our earlier case of *State v. Dozier*, 163 W.Va. 192, 197-98, 255 S.E.2d 552, 555 (1979), the issue arose in the more usual context by way of self-defense and we said:

"[T]he defense would be entitled, in the event of a retrial, to elicit testimony about the prior physical beatings she received in order that the jury may fully evaluate and consider the defendant's mental state at the time of the commission of the offense. *State v. Hardin*, 91 W.Va. 149, 112 S.E. 401 (1922); *See generally*, 6 Pepperdine L.Rev. 'The Battered Wife Syndrome: A Potential Defense to a Homicide Charge' 213-29 (1978)."

*State v. Hardin*, 91 W.Va. 149, 112 S.E. 401 (1922), cited in *Dozier*, did not involve a battered woman, but rather our traditional self-defense law which recognized that *any* defendant who relied upon self-defense could "prove prior attacks made by the deceased upon him." Syllabus Point 1, in part, *State v. Hardin, supra.* The reason evidence of prior acts of violence toward a defendant by the deceased is relevant is because it relates to the reasonableness of the defendant's belief that the deceased intended to inflict serious bodily injury or death and, as a consequence, the defendant was justified in the killing. We explained this principle in the single Syllabus of *State v. Green*, 157 W.Va. 1031, 206 S.E.2d 923 (1974):

> " 'Where, in a trial for murder, there is competent evidence tending to show that the accused believed, and had reasonable grounds to believe, that he was in danger of losing his life or suffering great bodily harm at the hands of several assailants acting together, he may defend against any or all of said assailants, and it is reversible error for the trial court to refuse to instruct the jury to that effect.' Point 4, syllabus, *State v. Foley*, 128 W.Va. 166 [35 S.E.2d 854 (1945)]."

*See also State v. W.J.B.*, 166 W.Va. 602, 276 S.E.2d 550 (1981); *State v. Donahue*, 79 W.Va. 260, 90 S.E. 834 (1916).

In cases involving the battered woman's syndrome, more discrete factors come into play which derive from psychological studies.[2] First, it is recognized that often the homicide is not triggered by an act of violence toward the defendant that would meet the traditional standard of threatening serious bodily injury or death. However, it is shown by competent psychological studies that women who have suffered severe and prolonged physical abuse can lose the capability to objectively determine the degree of danger. The essential relevancy of the testimony in this area was summarized by the New Jersey Supreme Court in *State v. Kelly*, 97 N.J. 178, 204, 478 A.2d 364, 377 (1984):

> "We do not mean that the expert's testimony could be used to show that it was understandable that a battered woman might believe that her life was in danger when indeed it was not and when a reasonable person would not have so believed.... Expert testimony in that direction would be relevant solely to the honesty of the defendant's belief, not its objective reasonableness. Rather, our conclusion is that the expert's testimony, if accepted by the jury, would have aided it in determining whether, under the circumstances, a reasonable person would have believed there was imminent danger to her life."

A second area in which courts have recognized the validity of psychiatric testimony regarding the battered woman's syndrome is in explaining to the jury the associated dependency that occurs whereby the abused woman is unable to free herself from her situation or report the abuse to the authorities.[3]

Most courts that have addressed the battered woman's syndrome have recognized that expert testimony can be utilized to explain the psychological basis for the syndrome and to offer an opinion that the defendant meets the requisite profile of the syndrome. *See Terry v. State*, 467 So.2d 761 (Fla.App.1985); *Smith v. State*, 247 Ga. 612, 277 S.E.2d 678 (1981); *People v. Minnis*, 118 Ill.App.3d 345, 74 Ill.Dec. 179, 455 N.E.2d 209 (1983); *State v. Hodges*, 239 Kan. 63, 716 P.2d 563 (1986); *Commonwealth v. Rose*, 725 S.W.2d 588 (Ky. 1987); *State v. Anaya*, 438 A.2d 892 (Me. 1981); *May v. State*, 460 So.2d 778 (Miss.

**2.** *E.g.*, Buda & Butler, *The Battered Wife Syndrome: A Backdoor Assault on Domestic Violence*, 23 J.Fam.L. 359 (1984); L. Walker, *The Battered Woman* (1979); R. Langley & R. Levy, *Wife Beating: The Silent Crisis* (1977).

**3.** The Georgia Supreme Court offered this observation taken from expert testimony in the record before it in *Smith v. State*, 247 Ga. 612, 618–19, 277 S.E.2d 678, 683 (1981): "Because there are periods of harmony, battered women tend to believe their husbands are basically loving, caring men, that they themselves are somehow responsible for their husbands' violent behavior, and that they are low in self-esteem and feel powerless."

1984) (dictum); *State v. Kelly,* 97 N.J. 178, 478 A.2d 364 (1984); *State v. Gallegos,* 104 N.M. 247, 719 P.2d 1268 (1986); *People v. Torres,* 488 N.Y.S.2d 358, 128 Misc.2d 129 (N.Y.Super.1985); *State v. Leidholm,* 334 N.W.2d 811 (N.D.1983) (dictum); *State v. Hill,* 287 S.C. 398, 339 S.E.2d 121 (1986); *Fielder v. State,* 683 S.W.2d 565 (Tex.App. 1985); *State v. Allery,* 101 Wash.2d 591, 682 P.2d 312 (1984); Annot., 18 A.L.R.4th 1153 (1982).

We recognize that the trial court was presented with an unusual factual situation, as the defendant had been divorced from the victim for almost four and one-half years. She had since remarried, but her former husband had continued to seek her attention and to threaten her.

■ The defendant complains that Dr. Litton was not permitted to testify about individual incidents of violence against the defendant. No attempt was made to utilize them in a hypothetical question. As we have earlier pointed out, the defendant testified to them at length. The trial court permitted both experts to give their opinions as to the defendant's mental condition resulting from the relationship, her belief that the victim was dangerous, and her inability to extricate herself from the situation. Moreover, the trial court gave the self-defense instructions proffered by the defense. For these reasons, we find no error in the trial court's handling of this issue.

## IV.

It is also alleged that the trial court improperly excluded testimony regarding prior acts of violence by the victim which, the defendant argues, was relevant to her claim of self-defense. During an *in camera* hearing, the defendant examined Bernice Rabel, the mother of the victim's previous wife. She testified generally that during and after her daughter's marriage to the victim, his conduct was very threatening and violent. She related only two specific incidents of such behavior.

■ On one occasion, the victim had attempted to force Ms. Rabel's automobile off the road while his baby daughter was riding as a passenger. On another, Ms. Rabel allegedly observed the victim holding a lighted cigarette near the baby's feet and watching her jerk away. She testified that these two events occurred shortly after the couple's divorce in 1969 and before his marriage to the defendant. There is nothing in the record indicating that the defendant was aware of these incidents which is generally a requisite condition of admissibility, as indicated in Syllabus Point 3 of *State v. Gwinn,* 169 W.Va. 456, 288 S.E.2d 533 (1982):

> " 'In a prosecution for murder, where self-defense is relied upon to excuse the homicide, and there is evidence showing, or tending to show, that the deceased was at the time of the killing, making a murderous attack upon the defendant, it is competent for the defense to prove the character or reputation of the deceased as a dangerous and quarrelsome man, and also to prove prior attacks made by the deceased upon him, as well as threats made to other parties against him; and, *if the defendant has knowledge of specific acts of violence by the deceased against other parties,* he should be allowed to give evidence thereof.' Syllabus Point 1, *State v. Hardin,* 91 W.Va. 149, 112 S.E. 401 (1922)." (Emphasis added).

■ The trial court also ruled that the testimony was inadmissible as it was too remote, the acts having occurred some fifteen years before the shooting in question. Our general rule on reviewing a determination that evidence is too remote in time to be admissible is stated in Syllabus Point 6 of *State v. Duell, supra,* where the incident occurred seven years prior to the homicide:

> " 'Whether evidence offered is too remote to be admissible upon the trial of a case is for the trial court to decide in the exercise of a sound discretion; and its action in excluding or admitting the evidence will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.'

Syl. pt. 5, *Yuncke v. Welker*, 128 W.Va. 299, 36 S.E.2d 410 (1945)." [4]

We do not believe the trial court abused its discretion in excluding the proffered testimony.[5] For the reasons discussed above, the judgment of the Circuit Court of Raleigh County is affirmed.

Affirmed.

---

4. This case was tried before the adoption of the West Virginia Rules of Evidence which became effective on February 1, 1985. The remoteness problem would be analyzed under Rule 403. *See* F. Cleckley, *supra* at 302.

5. The defendant also asserts on appeal that the trial court improperly sent a special interrogatory to the jury with regard to the defendant's use of a weapon under W.Va. Code, 62–12–2. This issue was not raised below. Although the defendant argues that the interrogatory foreclosed her consideration for probation, it is apparent from the record that the trial court did not deny probation for this reason, but because of the severity of the crime.